CHIEF JUSTICE PETERS
debivered the following opinion:
The legislative enactments and subsequent proceedings which produced this litigation are recited substantially in the separate opinions delivered by Judges Robertson and Williams at the same time this is delivered, and will not therefore again be repeated.
Whether or not these acts of the Legislature are in conflict with the Constitution of the United States, or of the Constitution of the State of Kentucky, or both, are the important questions now to be decided.
*555 No judge can approach the decision of such questions without feeling oppressed by the magnitude of the subject, and the weight of responsibility resting upon him; but when they are brought before him, if he shall, in their examination, exercise all the understanding with which he has been blessed, and decide them with the independence which is required of* him, he will have discharged his duty.
In consequence of the then existing war between the United States and the Confederate States, Congress, on the 3d of March, 1863, passed an act by which all able-bodied male citizens of the United States, and foreigners who had declared their intention to become citizens, between the ages of twenty and forty-five years, were declared to constitute the national forces of the country, and made liable to perform military duty when called out for that purpose by the President. The act provides for the division of the country into districts, in each of which an enrollment board was to be established, the persons of the designated ages to be enrolled, and were then liable to a draft, and those drafted were to be called into the service of the United States, and to continue in the service for three years; but they could be discharged from the draft by furnishing an acceptable substitute, or by paying the commutation sum of three hundred dollars; and all who failed to report were to be considered deserters, and to be dealt with accordingly.
By an act of Congress, approved 24th of February, 1864, the commutation privilege was repealed; but those enrolled were allowed to furnish acceptable substitutes who were not subject to draft, nor, at the time, in the military service of- the United States. And all able-bodied male colored persons, between the agres of twenty and forty-five years, residents of the United States, were *556 required to be enrolled, and declared to constitute a part of the United States forces. The 2d section of this act provides that the quota of each ward of a city, town, township, precinct, &c., should be, as nearly as possible, in proportion to the number of men resident therein, liable to render military service. And Congress has, by various enactments from time to time, fixed the compensation to be paid to volunteers and to drafted soldiers, and provided for raising the vast sums of money required to make said payments, by taxing the people of the United States as citizens thereof, and collecting these sums through the agency of Federal officers appointed by the President.
At the time of these enactments the country was engaged in a civil war unparalleled in magnitude; the army in the field had been so diminished by sickness and the casualties of war that additional troops were required; volunteering had ceased, and, to raise the requisite number, it was necessary to resort to the draft, which Congress had restricted to the particular class designated, excluding or exempting all others. The enrolling board of Gallatin county had enrolled and identified by name the persons composing that class, and the effect of the draft, if one had taken place, would have been to set apart those of the class who should fill the quota required of the county; and they would then become the immediate beneficiaries of these legislative enactments. But if, with the money raised by the military committee, a sufficient number of recruits were procured to fill the requisition, whereby the draft was avoided, which seems to have been the case, it was certainly a relief and direct benefit to the class liable to the draft, and there can be no difference in principle whether the draft had taken place or not.
*557 Every citizen of the United States owes allegiance to his government, and, in times of war and públic danger, when his country needs his services, each one is bound to render such service as may be required of him by Congress; and if one be required, on account of his physical ability and fitness, to perform military service, and another, who is not able, from age and infirmity, to perform that kind of service, be required to advance money to feed and clothe the soldier, what is done by each is done in discharge of his obligation to his country. It is, then', scarcely necessary to say that the obligation upon each one was personal and exclusive. This becomes self-evident by the statement of the proposition.
Suppose, then, a portion of the citizens of Gallatin county had procured the passage of an act of the Legislature authorizing the county court to levy and collect a tax from the citizens of said county to pay the revenue tax assessed upon the income of one hundred of the wealthiest men of the county, under the act of Congress, to aid in the support of the armies of the United States, and thereby relieve these wealthy citizens from the payment of the same. Could there be a doubt of the want of constitutional authority in the Legislature to pass such an act? And yet how does the case supposed differ in principle from the act now under consideration ? The one discharges an obligation for military services — the other discharges a debt owing in money.
But the case of Speer et al. vs. School Directors of Blairsville, decided by the supreme court of Pennsylvania, and reported in the September number, 1865, American Law Register (p. 661), is relied upon by counsel to sustain the position assumed by them.
One, and it may be said the principal, ground upon which a majority of the court sustained the act of the *558 Pennsylvania Legislature, similar to these now before us, was, that the taxation relieved a community “ from the stern demands of war, and averted a public injury.”
After quoting from the act of Congress of the 24th of February, 1865, the 2d and 3d sections, the court says :
“Volunteers are, therefore, by law accepted in relief of the municipality from a compulsory service, to be determined by lot or chance. Does this relief involve the public welfare or interest? The answer rises spontaneously in the breast of every one in a community liable to the military burden. It is given, not by the voice of him alone who owes the service, but swells into a chorus from his whole family, relatives, and friends. Military service is the highest duty and burden the citizen is called to obey or to bear. It involves life, limb, and health, is therefore a greater ‘ burthen ’ than the taxation of property. The loss or the injury is not confined to the individual himself, but extends to all the relations he sustains. It embraces those bound to him in the ties of consanguinity, friendship, and interest, to the community which must furnish support to his family if he cannot, and which loses in him a member whose labor, industry, and property contribute to its wealth and resources, who assists to bear its burdens, and whose knowledge, skill, and public spirit contribute to the general good. Clearly the loss of that part of the population upon whom the greatest number depend, and who contribute most to the public welfare by their industry, skill, property, and good conduct, is a common loss, and therefore a general injury. These are alike subject to the draft. The blind and relentless lot respects no age, condition, or rank in life. It is therefore clearly the interest of the community that those should serve who are willing, whose loss will sever the fewest ties and produce the least injury.”
*559 “ The bounty is not a private transaction, in which the individual alone is benefited. It benefits the public by inducing and enabling those to go who feel they can best be spared. It is not voluntary in those who pay it. The community is subject to the draft, and it is paid to relieve it from a burthen of war. It is not a mere gift or reward, but a consideration for service. It is, therefore, not a confiscation of one man’s property for another’s use, but is a contribution from the public treasury for a general good.”
When stripped of the beautiful declamation in which the opinion abounds, and of which this war has been a fruitful theme all over the land, it amounts to this: that the whole community was subject to the draft, and “that blind and relentless lot which respects no age, condition, or rank in life,” would take only those “whose labor, industry, and property constitute the wealth and resources of the community,” and whose knowledge, skill, and public spirit make up all good in it, and upon whom the greatest number depends; and that those who, by the offered bounty, may be induced to take their places, are of little worth, if not positive evils in 'the community.
The authority for these assumptions is not cited; but certainly the whole community was not subject to the draft, as has already been abundantly shown. But if the community were interested in a successful prosecution of the war, skill and fidelity are elements in those engaged as soldiers which greatly contribute to success, and in the proportion that the community would be benefited by a speedy and successful termination of the war, it would be interested in having the armies filled with skillful, efficient, and faithful soldiers.
The argument rests upon the assumption that the services of the conscript are too valuable to the commu *560 nity to be dispensed with, and that the public interests will be promoted by paying the bounty to a substitute, thus making the validity of the Pennsylvania enactment depend on the character of the conscript.
But in the case of Taylor vs. Thompson, from the supreme court of Illinois, January number 1867, of American Law Register, new series, 174, the validity of an act of the Legislature of Illinois, similar to those now under consideration, is attempted to be sustained mainly upon the ground that the military services called for under the acts .o.f Congress “ were assessed against a town as a corporate community, and as such community, it renders the service by the aid of a corporate tax.” “ The tax is levied,” as is said in the opinion, “ not for the benefit of the volunteers who receive its proceeds, but for the community to whom it brings relief.”
This, though the most plausible ground, is not less fallacious. If the military service required by the Government was owing by towns in their corporate capacity, when required in counties it was likewise due from them in their corporate capacity, and the tax, when assessed, would be for the benefit of the county.
The act of Congress of the 3d of March, 1863, heretofore in part quoted in this opinion, declares who shall constitute the national forces; by a subsequent act, able-bodied colored men within the specified ages were added, and the commutation clause of the act of 1863 repealed.
None others can be lawfully required to perform military service; and when any of those constituting the national forces were conscripted, they were compelled to obey either by performing the, duties of soldiers in person, or furnishing an acceptable substitute; and, if they failed to respond in the one way or the other, they were liable to be punished as deserters. Whatever, then, may be the *561 great moral obligation resting upon every citizen, as such, to defend his country in time of danger, whenever a government has declared, by its legally constituted authority, by whom that obligation shall be discharged, the law acta upon them individually; they alone upon whom the obligation is thus imposed owe it in their own right, and the residue of the community is discharged, and a tax upon that community for the relief of those who are thus legally bound, cannot be regarded in any other light than as a tax for their private benefit. >
The next question demanding attention is, do these enactments conflict with the Constitution of the United States and the powers of Congress under it ? In order to a correct solution of that question, it is proper to ascertain what these powers are. Let the 8th section of the 1st article of that instrument be examined, and it will be found to contain certain powers enumerated which are expressly granted. The 1st of which is to lay and collect taxes, duties, imports, and excises; to pay the debts and provide for the common defense and general welfare of the United States, &c. 11th. To declare war, &c. 12th. To raise and support armies, &c. The 18th and last is to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all othei powers vested by this Constitution in the government of the United States, or any department or officer thereof.
These powers are complete in themselves, and impart to Congress plenary sovereignty over all the objects specified in the grant.
In the exercise of these powers, Congress passed the acts supra for the raising of troops from the citizens of the counties, cities, townships, &c., of the several States, possessing the prescribed qualifications, and denominated *562 “ national forces,” and mustering them into the service of the United States through the officers or agents of the government, without, and wholly independent of, any action of the States as such, or their authority — the counties, cities, townships, &c., being referred to, to equalize the burdens and facilitate the work. Congress also provided for paying the troops and supporting them by laying and collecting taxes from the citizens.
It is ably and earnestly argued by counsel for appellees, that the power to raise and support armies is not an exclusive power in Congress; and the second paragraph of the 10th section of article 1 of the Constitution is relied upon in support of the argument, in reference to which he' says: “ The only prohibition upon them (referring to the States) is, that they shall not keep troops or ships of war in time of peace without the consent of Congress, clearly implying that they may keep them in time of war without that consent.” So much of the paragraph referred to as relates to the subject in hand reads as follows :
“No State, without the consent of Congress, shall lay any duty of tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another State or with a foreign power, or engage in war unless actually invaded, or in such imminent danger as will not admit of delay.”
The language of the grant to Congress of the powers “ to declare war, and to raise and support armies,” is very direct, plain, and comprehensive, and is as effectual to convey the whole power over the subject to Congress, as if the language had been, Congress alone shall have the power to raise and support armies.
And besides, the States, by the grant of these powers to the Congress of the United States, deprived themselves of all right to exercise the same powers to any extent whatever.
*563 But if there could be any serious doubt as to the extent of these powers, “ it is a well-settled rule, that the objects for which they were given — especially when those objects are expressed in the instrument itself — should have great influence in the construction.”
- To provide for the common defense and general welfare of the United States, are among the declared objects for which the constitution was ordained and established ; and as the powers are conferred on Congress in express terms, the obligation rests upon it imperatively to effectuate these objects.
The States having by this comprehensive grant surrendered their powers over the subject, would not have had the right to keep troops or ships of war “ in time of peace, or engage in war when invaded or in imminent danger,” with the consent of Congress, if the right had not been secured to them by the ninth section before referred to; and the implication that they may keep them in time of war is not allowable, because the power to do so was surrendered by the grants in the eighth section,' and is not restored in the tenth, or any other section in the Constitution.
If the States have the power to raise and support troops to aid the Federal government to provide for the common defense of the United States, they must, as a necessary consequence, have the power to lay and collect taxes to carry out this power, and that would be an exercise of the very power, by the States, which they have surrendered to Congress. The States have the exclusive right to impose taxes for the support of their own State governments. This right Congress cannot interfere with; and, by the exercise of this right, the States do not exercise any portion of the powers surrendered by them to Congress, or to the United States. But as the States *564 have granted the power to Congress to lay and collect taxes for the payment of the debts, to provide for the common defense and general welfare of the United States, any attempt by State legislation to exercise the same power would be incompatible with, and repugnant to, the exercise of the power by Congress.
The case of Booth vs. Town of Woodbury, decided by the supreme court of Connecticut, and reported in the February number, 1866, of American Law Register (new series, p. 202), is relied upon with great confidence by counsel for appellees as conclusive of this case. The high character of that court entitles that opinion to great respect, but in some of the positions, and in the conclusion to which the court arrives, we cannot concur.
The power of the State Legislature to impose a tax for the same purposes for which that power was granted by the Constitution of the United States to Congress, is taken up and treated in the opinion as a conceded postulate, and is not discussed. This view, for the reasons already stated, is not concurred in.
Again, while conceding impliedly, that if the money to be raised by taxation to pay the bounty provided for would be inhibited by that clause of the Constitution which prohibits the “taking of.private property for pubr lie use without just compensation,” the court decides that that clause does apply to taxation; but applies to cases where property taken for public use, from one or more individuals only, by right of eminent domain, is taken, not as his or their share of an apportioned public bur-then, but as something distinct from and more than his or their share of the public burthens, and therefore the justice and necessity of a constitutional provision for compensation — a position in conflict with the established doctrine of this court.
*565 While, therefore, we hold that these acts are invalid as to those who never participated in procuring their passage, and have never ratified them, and have received no direct benefit therefrom, we are equally clear that all those who were instrumental in the procurement of their passage, have acquiesced in and approved them, or have been the recipients of benefits under them, should not escape responsibility, and, in equity and good conscience, should be compelled to bear their portions of the burthens imposed by them.
Wherefore, the judgment of the circuit court sustaining the demurrer to the petition is reversed, and the cause remanded for further proceedings consistent herewith.'
Believing that the reasons herein stated are applicable to the case of Cloud vs. Coleman, from the Boone circuit court, and the two cases rest upon the same principles, we concur in the conclusion of Judges Williams and Robertson in this case.
Judge Hardin concurs in this opinion.
JUDGE ROBERTSON
delivered the following opinion:
These two separate cases between different parties, involving kindred facts and questions, have been consolidated in argument, and will therefore be decided together.
To avoid the contingencies of the impending draft of Federal soldiers, fixed for September, 1864, a popular assemblage of the citizens of Gallatin county, consisting of much more than a majority, appointed and instructed a committee to procure funds sufficient for obtaining volunteer recruits to supply the quota prescribed for that county. That committee borrowed about twenty thousand dollars, and made such a distribution of the fund *566 as to secure the enlistment of the requisite number of volunteers, and thus relieve their county of the draft.
To “reimburse” the sum thus expended, the Legislature, on petition, passed acts January 21st and June 3d, 1865, authorizing the county court of Gallatin to issue bonds and levy a sufficient capitation and ad valorem tax on the citizens and property of that county. The appellants of the first class, as a portion of the taxable citizens, enjoined that procedure on the alleged ground that they neither assented to the appointment of the committee nor to the enactment of the statute; and that, therefore, such a local taxation for such a purpose was unconstitutional. But the circuit court, dissolved the injunction and dismissed the petition; and we are now to revise that judgment.
On the 19th of September, 1864, eight hundred and fifty-four pei’sons were formally drafted in Boone county, subject to reduction to the required number of four hundred and twenty-seven. Afterwards, to relieve and assist the drafted men, a large majority of the citizens of Boone, not shown to have included any of the second class of appellants, instructed a committee, appointed for that purpose, to borrow a sufficient sum from banks on the credit of the county. Considerably over one hundred thousand dollars were accordingly thus borrowed and expended in paying to each of seventy-eight drafted men, who preferred to serve, four hundred dollars, and to each of about one hundred and twenty drafted men, who had already purchased substitutes, four hundred dollars on that account; and the residue was used in hiring substitutes for others.
After all this, “ to avoid the draft,” or, more precisely, its coercive consequences, the Legislature, on the 26th of May, 1865, authorized the county court of Boone to issue *567 bonds and levy a tax for an amount sufficient to refund the sum thus borrowed and appropriated; and, under that authority, said court ordered the execution of bonds for one hundred and seventy-eight thousand dollars, payable in seven annual installments, with legal interest from the 3d of July, 1865; and, to secure payment, levied on the citizens of the county a capitation tax of three dollars, and an ad valorem tax of seventy-five cents on each one hundred dollars of their taxable property, to be continued until full payment of the entire principal and interest.
The second class of appellants, as non-concurring citizens of Boone, enjoined that procedure as unconstitutional; and the circuit court having dissolved the injunction and dismissed their petition, they also appeal to this court from that judgment.
The Gallatin case will be first considered. The imposition of the tax was necessarily a legislative act, which neither a majority of the citizens of Gallatin nor its county court could have had legal authority to levy without special power delegated by the Legislature of the State, and that power, so far as constitutional, might have been delegated either with or without the concurrence of all the people of the county. Conclusive authority has settled that question. For any local object there may be such local taxation. Although equality is a fundamental element of constitutional taxation, yet a local tax for a local purpose may approximate equality of burthen as nearly as the subject and occasion will reasonably allow. Exact and universal equalization is never attainable. As each county is a quasi corporation to the extent of its own peculiar concerns, the burthen of supporting its own exclusive interests should be borne by itself alone; and this, as among all the counties of the State, is just equality; but, in distributing the bur- *568 then among the people of a county, as among those of the State, theoretic equalization, precisely according to the degree of each citizen’s interest, is impracticable, because the different degrees of interest — slight or great, direct or indirect, remote or immediate — are inappreciable by any practical standard or possible proof. Among all persons interested, taxation in proportion to numbers and means is the true constitutional rule; and, therefore, all who have an interest and are contributory, though in various degrees, must submit to that mode of taxation.
The organic law of the Union, necessarily supreme over all the States, wisely confers on Congress, representing all the people of all the States for national purposes, the power to declare war, and, by equal taxation, to provide the means of conducting the war efficiently; and this great power and important trust are exclusive of all interfering State authority. No State, by her own legislation, either friendly or unfriendly, can tax her own citizens for aiding or opposing the prosecution of a national war for which they have been or are liable to be taxed by the general government. Her citizens cannot be taxed by her for a national end in which all the citizens of all the States are equally interested as a common concern, intrusted exclusively to their common government; nor can the citizens of any State be taxed by both local and Federal legislation for the same national purpose.
• If, then, the Gallatin tax was imposed for raising troops supplementary to those raised or required by Congress, or to pay those raised or ordered by Congress an additional compensation, it was illegal and unenforceable against any citizen who did not co-operate in imposing it. Nor could the Kentucky Legislature tax the people *569 of Gallatin alone for any purpose in which they had not a separate and peculiar local interest.
These fundamental principles must solve the problem now before us for solution. The object of the Gallatin tax was neither to raise Federal troops, uncalled and unprovided for by the general government, nor pay them after enlistment any compensation accessional to that which that government had provided for all its troops; but the sole object of the tax was, to the extent of the call which had been made on that county, to encourage voluntary instead of involuntary enlistments, and thereby to avoid the hazards of an impending lottery for coercive service, with all its inconveniences, distresses, and humiliations. That object was both prudent and legal; and, consequently, the tax for effectuating it was constitutional, if the county of Gallatin was peculiarly interested in averting the draft about to be made on its citizens.
The voluntary association of the people of that county, as constituent elements of that body politic, distinct from all others in local character and destiny, made them one as to all their local interests; and this is an inevitable consequence of their elective cohabitancy; and another like consequence is their legal liability to all local burthens resulting from the necessity of upholding their own peculiar interests, even though not felt as the individual interest of some of them.
This, though there1 may be difficulty in defining its precise extent, is the principle which, when properly applied, sustains the legality of all local taxation which is prescriptively established or has been judicially adjudged to be legal. It has been authoritatively applied to roads, even railroads in or through a county, although the citizens of other counties and States enjoy a common use of them; and the reason is, that the county in which *570 they are located has a peculiar, though not an exclusive, interest in them; and even though, also, some of the citizens of the same county so collectively benefited have no local or personal interest in them which is either apparent or appreciable. Then does the case we are now considering come within the range of this same prinei,ple? The impending draft was an incubus on Gallatin county as a separate community, and no other county, as such, was interested in averting that draft. All the citizens of Gallatin had both a common and a peculiar interest in the social condition, the tranquility, and the productive labor and mind of their own county. And all those elements of happiness and prosperity were, to some extent, jeoparded by the contingencies of coercive enlistments, blind as to all personal, social, and economical considerations, and regardless of all domestic ties and kindred sympathies. The large proportionate class subject to the heavy draft were intertwined with the entire county by consanguinity, affinity, or other endearing ties; and on whose households or friends the mechanical lots would fall, none could foresee — perhaps, against their will, poor and useful mechanics might be separated from their dependent and helpless families — poor and dutiful sons from destitute and widowed mothers — and .poor and good husbands from their wives and children who could not spare them. And the danger to all of such descriptions struck a cord of common interest and sympathy, whose discordant tones might painfully have vibrated throughout the entire county as one aggregate family for all local concerns.
But voluntary enlistments might embrace not only persons of other counties and even States, but would, necessarily, consist of such only as preferred to serve for the pay, and whose absence, consequently, might be *571 spared with the least social disturbance and local inconvenience or loss.
Then why had not the county of Gallatin an obvious and essential interest in averting the draft by the purchased substitution of volunteers? And why, if such substitution were desirable, should the whole burthen be made to fall on the class legally subject to the draft? It was the duty of every citizen equally to defend his country against invasion, and co-operate in upholding his national government and enforcing its laws. The selection of a representative class to serve as soldiers for all was not because they had a larger stake in the common cause, or were under any peculiar obligations to defend it at the cost of heavy sacrifice of personal ease and interest, and perhaps of their lives also, but it was only because their ages were presumed to fit them best for efficient service. That rather arbitrary exaction of constrained military service by the chosen class did not exonerate others from their co-equal duties to defend the same cause in other ways, but even imposed on them a moral obligation to assist in relieving from hazard themselves and those who, by the accident of birth alone, were liable to be selected as their representatives in the field. The class made subject to draft were, in addition to their military service, made equally with the exempt class liable to taxation for the expenses of the war in defense of the property, the liberty, and the lives of all. And could it, therefore, be either unequal, inequitable, or unconstitutional, to distribute among all thus interested in the same patriotic end, and bound by the same allegiance to contribute to the procurement of voluntary relief from compulsive service, in fulfillment of the national call on their county for its prescribed quota of soldiers?
*572 If none but the devoted class should be required to contribute to that object, a majority, and perhaps all of them, might prefer the hazards of the die; and if any of them should prefer the chances of a lottery, what power could the Legislature have to deprive them of that legal right? and if all of them should prefer the commutation by distributive contribution, no law authorizing or exacting such contribution would be necessary or proper.
The object of the tax being thus apparently for the local benefit of the county, and there being no essential difference in principle between taxation to raise a fund for procuring volunteers and taxation for reimbursing the amount borrowed on a popular pledge of the faith and credit of the county, and the distribution of which actually relieved the county from the draft, the conclusion would seem to be logical that the judiciary, which should not nullify a legislative act unless beyond a rational doubt it be deemed, on full and dispassionate consideration, to be unconstitutional, might hazard a dangerous precedent by declaring the legislation in this case void, and especially when the more safe and consistent conclusion inclines in favor of its constitutional validity. To let it stand as law would therefore appear to be the true and prudent judicial conclusion. And this has been, without one exception, the judgment of all the courts of the other States which have adjudicated on the question we are now considering.
But the majority of this court, for reasons given by them, concurring in the opposite conclusion as to all the people of Gallatin except those who consented to or co-operated in helping to impose the tax, the judgment sustaining the demurrer to the petition must be reversed, and the cause is remanded for further proceed *573 ings conformable with the opinion of the majority of this court.
2. But in the Boone case, altogether different in principle, the court unanimously adjudges the tax unconstitutional as to the appellants, who, as admitted by the pleadings, had no agency, active or passive, in the imposition of it. The decisive difference between these two cases is, that in the Gallatin case the tax was imposed for preventing a draft and thereby relieving the county from all its contingent troubles, privations, and unhingements, while in the Boone case, the required recruits having been already drafted, the tax was levied for the sole purpose of paying the drafted men who were willing to serve $400 each, in addition to the full and equal pay provided by the Federal government for all its soldiers, or of reimbursing what some of them had given for substitute's, or of buying substitutes for others. The principle hereinbefore defined interdicted the tax for either of the first two purposes — taxation by the State being unauthorized for a national purpose' — -for which the general government, in the exercise of exclusive power, had taxed the same people to the full extent deemed either necessary or proper.
The Federal government, in the exercise of its exclusive power to raise and support armies, having provided equal and ample compensation for all its soldiers, to be paid by Kentucky to the extent of her distributive ratio, and her citizens being, to that extent, already taxed equally with those of all her sister States, her Legislature could have no authority to tax any portion of them again for the same national service, and thereby exact from them more than the citizens of other States were required to contribute to the same common cause. As before said, the citizens of a State cannot be con *574 stitutionally subjected to both State and Federal taxation to support the army of the United States, or any portion of it, more than another.
Considered in the light of supplementary compensation, therefore, the Boone tax is clearly unconstitutional as to all the citizens who in no way aided in imposing it.
Considered in the last phase, of compulsory contribution to buy substitutes for a portion of the soldiers who had been previously drafted, the tax is apparently a gratuity without any commensurable consideration to the county. The perils of a draft, which might, while they were impending, have been a sufficient consideration for taxing the county for averting them, having passed away, and the county having been exonerated by the draft actually made, the persons drafted were personally and alone bound either to serve or procure substitutes; consequently, compulsive contribution to them by others, then in no way liable or apparently interested, would be taking private property without compensation; and to take one man’s propei'ty to give it to another, however the act may be disguised or misnamed, is spoliation, and in no true or legal sense taxation.
For all the purposes for which it was imposed, the Boone county tax was, therefore, unconstitutional as to the appellants, if, as they allege in their petition, they neither consented to, nor aided in, its imposition. But, as to the large majority who did so aid and consent, the tax was self-imposed, and they have neither legal nor moral right to repudiate it, nor to appeal to a court of equity to resist its enforcement.
Wherefore, the judgment dissolving the injunction in the Boone case is reversed, and the cause remanded, with instructions to overrule the demurrer to the petition.
*575 JUDGE WILLIAMS
delivered the following opinion:
■ Some time in the year of 1864, and after the President of the United States had, by his proclamation of July, 1864, called for five hundred thousand volunteers to suppress the late rebellion, in which a draft to fill the number called for, unless made by volunteering by a given day, was also announced, a large number of the citizens of Gallatin county met in Warsaw and appointed a military committee, with authority to raise a recruiting fund not exceeding twenty thousand dollars to procure recruits, and thereby relieve the citizens of the county from draft under said call of the President.
The committee did raise the fund, and the county was relieved from the draft as set out in the preamble to the first enactment of January 21st, 1865, entitled “An act authorizing the county court of Gallatin to levy a tax to raise a reci’uiting fund to avoid a draft in said county.”
June 3d, 1865, an amendatory act was also approved.
Under the authority of these acts, the county court of Gallatin, at its June term, 1865, proceeded to levy a tax of eighty-five cents on the hundred dollars of taxable property, and a capitation tax of six dollars on each white and each black male tithe in said county within military age.
The appellants, Ferguson, Chambers, Hughes, and others, resist this taxation as being unconstitutional and void, and petitioned the circuit judge for an injunction against the county court and officers of Gallatin from proceeding to collect said levies, which he granted, but which the court subsequently dissolved, and dismissed appellants’ petition.
They alleged that they did not take part in the procurement of said enactment, had never assented to the assessment, and were not benefited by it.
*576 Resident soldiers of the county of the then pending war were exempted from the tax.
The county court of Boone, at its July term, 1865, ordered the issual of county bonds to the amount of one hundred and seventy-eight thousand dollars, and ordered the levy of an ad valorem tax of seventy-five cents on the hundred dollars of taxable property, and a capitation tax of three dollars for the year 1865, and to be annually continued, for the purpose of paying the annual interest and discharging the principal, which was to be paid in annual installments of twenty-four thousand four hundred dol£trs«
These orders of the county court were made under the authority of three several acts of the Legislature, approved January 18th, 1865, “ empowering the county court of Boone to execute bonds and levy a tax to raise funds to avoid the draft of 1864;” and an act approved February 22d, 1865, amending the above named act, and also one approved May 24th, 1865, entitled “ An act to empower the Boone county court to execute and sell bonds and levy a tax to pay the same, to raise a bounty fund to refund money expended in raising recruits for the United States service to fill the quota of said county.”
To prevent the sale of said bonds and the collection of said tax, Cloud and others sued from the circuit judge a writ of prohibition against the members of the county court and its collecting officer, which the court afterwards dismissed, and from which they appeal.
Appellants insist that said acts are without constitutional validity, and confer no authority to issue said bonds or to levy the tax; and, moreover, that the tax is unequal and unjust, as it taxes persons who were then in the Federal army discharging their military service, others who did not owe such service; and again, others, who *577 were non-residents and liable to military service in other States, and that they did not procure or ever assent to the said enactment nor the assessment, nor derived any benefit from it.
Soldiers of the then present war were exempted from this tax.
This enactment had been sought by public meetings in each civil district, numerously attended, which culminated in one of the largest meetings of the citizens at the county seat ever held there.
In making the articles of confederation of the United States, in article 8, it was originally agreed between the States, that “ all charges of war, and all other expenses that shall be incurred for the common defense or general welfare, shall be defrayed out of a common treasury, which shall be supplied by the several States in proportion to the value of all land within each State.”
The United States, under the articles of confederation, had no revenues, save such as were supplied by the States under said 8th article. The States retained the entire sovereign right of taxation and raising revenue. ■ The government formed by these articles could scarcely be called a government; it had neither an executive to execute nor a judiciary to administer its laws, and Congress was little more, as was once said by Chief Justice Taney, than a congregation of ambassadors representing so many sovereignties. •
But when the American people came to make a government under a written Constitution, after having achieved their independence from the mother country, they invested said government with the most absolute and sovereign powers for the purposes of its own preservation and within the specifications of the Constitution; *578 and these sovereign powers were delegated by the States and people of the States to the national government, because essential to it and not necessary to be, retained by the States; another class of powers were deemed not essential to it, and, whilst not so delegated, were prohibited to the States ; but all other powers were reserved to the States or people. Among the powers delegated to the United States are to be found those “ to lay and collect taxes, duties, imposts, and excises,” for the purpose of “paying the debts and providing for the general welfare of the United States;” and having delegated to the national government absolute and unlimited power of raising revenue by taxes, duties, imposts, and excises for its own purposes, there could be no reason the States should retain the power to raise by taxation or otherwise revenues for it or its purposes.
But so far as the State governments were concerned, they retained their unqualified sovereign right of raising revenue for their own purposes, to administer their laws, and protect and perpetuate their own existence.
But it was never intended that an absolute and unqualified power over the property of the citizen should exist in either the State or national governments for any and all purposes.
All taxation must, therefore, be predicated on the public benefit of the general or local community, or for corporate purposes.
The Legislatures of the States, being invested with legislative authority and bound to provide the necessary revenue, also having the power to make appropriations, must be the sole judges of the necessity of the tax and appropriation whenever the same partakes of a general nature, and cannot be controlled by the judiciary; and so of Congress for national purposes; but when it is a *579 special tax by a special law for a specific purpose, the judiciary may well inquire into the constitutional power of the Legislature to make the enactment; and, if found invalid, enjoin the officers attempting to coerce the taxes from so doing.
In 2 Kent's Com. (side p. 331, Comstock's edition), the learned commentator says:
“Every person is entitled to be protected in the enjoyment of- his property, not only from invasions of it by individuals, but from all unequal and undue assessments on the part of the government. It is not sufficient that no tax or imposition can be imposed upon the citizens but by their representatives in the Legislature; the citizens are entitled to require that the Legislature itself shall cause all public taxation to be fair and equal in proportion to the value of property, so that no one class of individuals and no one species of property may be unequally or unduly assessed.”
It is argued that the State may tax her citizens in aid of the national government, or she may authorize a local taxation when the tax is for the purposes of the local community or for corporate purposes; or that the State, having a common interest in the war to suppress the rebellion, may tax her citizens or authorize a county to tax its citizens for the purpose of raising national soldiers.
In the “ Bill of Rights " of our present State Constitution it is declared:
“ That absolute arbitrary power over the lives, liberty, and property of freemen exists nowhere in a republic, not even in the largest majority; ” and again, it is therein said, “that no man or set of men are entitled to exclusive separate public emoluments or privileges from the community, but in consideration of public services."
*580 Could a more arbitrary power oyer the property oí freemen be conceived than to confer upon the national government unlimited power of taxation for the purposes-of upholding its machinery and perpetuating its existence, including its army and navy, and, at the same time, recognize the same omnipotent power in the State Legislature to impose taxation upon the same people and property for the same identical purpose ?
The national government having fixed the compensation of the President, Vice President, Secretaries of War, State, Interior, Navy, &c., with all their subordinates, and members of Congress, and the judicial officers, and designated by what taxation, imposts, excises, and duties their salaries shall foe raised, would it not be the most arbitrary power in the States to say that these compensations were inadequate, and therefore they would tax the same people and the same property, by an additional assessment, to further add to these compensations ? And are the citizens liable to be taxed by both governments to pay the same men for the same services ? Or has the State a right in any manner to fix the compensation of the national officers or employees ? If so, two compensations may be fixed by the two governments, and the citizen’s property may be doubly assessed for the same identical purpose. Could our ancestors have intended to erect for us such an arbitrary frame-work of government? Certainly not. Then I apprehend it will not do to predicate the constitutional power to enact these local laws upon this ground.
Judge Story (in 5 Wheaton, 45) puts the concurrent powers of the two governments upon the most solid basis, and impregnable constitutional and political philosophy. He says : “ The Constitution containing a grant of powers, in many instances similar to those already existing *581 in the State governments, and some of these being of vital importance also to State authority and State legislation, it is not to be admitted that a mere grant of such powers in affirmative terms to Congress does, per se, transfer an exclusive sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion, that the powers so granted are never exclusive of similar powers existing in the States, unless where the Constitution has expressly in terms given an exclusive power to Congress, or the exercise of a like power is prohibited to the States, or there is a direct repugnancy or incompatibility in the exercise of it by the States.”
And, as an instance of the concurring powers, he says: “Why may not a State call forth its own militia in aid of the United States to execute the laws of the Union, or suppress insurrection or repel invasions? It would certainly seem fit that a State might do so, where the insurrection or invasion was within its own territory arid directed against its own existence or authority.'1''
By the surrender to the national government of the right to levy taxes, duties, imposts, and excises for its own purposes, the States never intended to surrender the power to tax for their own purposes; but, having conferred upon it the power to tax, &c., for its own purposes, there could be no necessity that the States should retain the taxing power for the same purposes; in other words, the power to tax for national purposes must, in its very nature, be an exclusive power in the national Congress, because vital to the national government, and in no sense so, as “ to State authority and State legislation.”
There is no such thing as a concurrent power in Congress and the State Legislatures to enact any law per *582 taining to the national government; but, when a like power is necessary and essential to the existence of both, then Congress may exercise it for the nation and the Legislatures for the States.
But, when invaded, the very .existence of the State government, as well as authority of the State laws, might depend on the aid its militia might give to the national forces, and doubtless the State could tax her citizens to pay her militia.
Is this a local taxation for the purposes of a local community, or is it a taxation for the purposes and benefits of a class of the local community ?• — and that not predicated upon valuable public services, but to exonerate them from rendering such service.
By an act of the Congress of the United States approved March 3, 1863, all able-bodied male citizens of the United States, and persons of foreign birth who shall have declared on oath their intention to become citizens, between the ages of twenty and forty-five years, with certain exceptions, are declared to belong to the national forces.
It divides the forces into two classes: 1st. Those between twenty and thirty-five, and all unmarried persons above thirty-five and under forty-five years of age. 2d. All others liable to military duty.
It directed a division of the country into districts, in each of which an enrollment board should be established.
The persons enrolled were subject to be called into the military service of the United States for two years from July 1, 1863, and to continue in such service for three years.
A drafted person was allowed to furnish an acceptable substitute or pay the commutation sum of three hundred dollars, and be discharged from the draft.
*583 Persons failing to report to be considered deserters, and to be dealt with accordingly.
All persons drafted to be assigned by the President to military duty in such corps, regiments, or branches of the service, as the exigencies may require.
By another act of Congress approved February 24, 1864, it is provided, that any one enrolled may furnish an acceptable substitute who is not liable to draft, nor at the time in the military service of the United States; the commutation privilege is repealed, and the distinction between the two classes is abolished, and both consolidated.
By this enactment “ all able-bodied male colored pei'sons between the ages of twenty and forty-five, resident in the United States,” are also directed to be enrolled, and constitute part of the national forces.
No longer were the States called on through their authorities to furnish troops, and to appoint commanders, and to organize them; but the national government, through its own agencies, went directly to the people as citizens of the nation, and owing allegiance to its government, and in duty bound to protect it; .therefore, each person enrolled was declared to be a national soldier, not a soldier of the State from which he might hail.
He was not a soldier to protect and defend his own State, but to protect and defend the national government, subject to its orders, and to go where it might direct.
It is true, his State might derive incidental protection from the defense of the national government; but this was afforded by every soldier from any of the other States, and the soldier from Kentucky was no more its protector than the soldier from Ohio, Indiana, Illinois, or other States. It was a call upon the able-bodied *584 male citizens of each county, within the military ages, to discharge a designated measure of military duty to the national government, and was in no sense a burden on the local community of any county. It did not embrace the larger portion of the people of any town, county, or State, but only those who were able-bodied males, not under twenty nor over forty-five years of age, embracing equally the slave who was subject to no taxation.
It fixed the compensation to the volunteer, the drafted, and the master of the slave; and, by varions enactments, Congress has provided by what character of taxation the revenue so essential to discharge these obligations, should be raised; and these, too, are raised directly from the people as citizens of the nation, through its own machinery, and not as citizens of the respective States or through their instrumentalities.
The enlistment of the soldier, his term of service, his duty, direction, and compensation, the means whereby this compensation should be raised, are all controlled and directed by the national authorities without the agencies of the States.
These local laws, when stripped of all sophistries, are just what they purport to be, and enacted for the purposes therein expressed, not to raise soldiers or to increase the military power of the national government, nor for the protection of the State, but to relieve those liable in these respective counties from the draft, or, in other words, to enable those subject to this military service to escape from it, by substituting others in their places, and which brings us to the great question whether an involuntary taxation, levied indiscriminately on the local community for such purpose, falls within the constitutional taxing power of the Legislature to coerce such involuntary assessments.
*585 But as it may be insisted that these local bounties were for the purpose of the more readily inducing volunteers to come forward, and thereby the public interest of the State and the general welfare was provided for, and falls within the objects and constitutional power of taxation, it may be replied that the enactment, execution, and administration of the national laws are also deemed beneficial to each State and the people thereof, as well as the military defense of the government.
But suppose the Legislature should deem the services of some eminent citizen in the Senate of the United States to be of so much importance to the general good of the State as to provide an additional salary over that paid by the United States, or should the services of some citizen of a congressional district be deemed of so much consequence by the people of the district as to induce them to offer a large additional salary to get his services in the House of Representatives in Congress, could the Legislature authorize these to be coerced by either a specific or local taxation from the unwilling ? Or should the services of some eminent citizen, either as a district judge of the United States for the State, or as a postmaster for some city, be deemed of sufficient value to induce an additional salary by the State or city; do such salaries fall within the legitimate powers of taxation, and would it be the exercise of such powers for the legitimate objects of taxation under the State Constitution ? And could a sufficient involuntary contribution be legitimately coerced ? And why not ? The government of the United States consists of sovereign powers conferred by the Constitution as surrendered by the States, and the United States Constitution,, and the acts of Congress enacted in pursuance thereof, are the supreme laws of the land, so declared by the Constitution. To Congress *586 was confided the enactment of such laws as should be appropriate and necessary to effectuate the purposes of the Constitution in making a national government, in protecting and perpetuating it, and especially was it authorized by article 1, section 8, United States Constitution: “To declare war;” “to raise and support armies;” “ to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions.” Whilst the States, by section 10, were prohibited from “ keeping troops or ships of war in time of peace, or engaging in war unless actually invaded, or in such imminent danger as will not admit of delay,” without the consent of Congress.
So the war-making, war-controlling, and peace-making power was vested in the national government, so far as it may be concerned; and the States, even with their own troops, could not engage in war without the consent of Congress, except to repel invasion, and when the emergencies were such as not to admit of delay.
And, by said section 8, Congress was invested with an unlimited power “ to lay and collect taxes, duties, imposts, and excises; to pay the debts, and provide for the common defense and general welfare of the United States.”
To this national and supreme will was confided the power to make the national laws, provide for the nation’s defense, determine the compensation of its officers and soldiers, and the means whereby the necessary revenues for these national objects should be raised; and an additional compensation to the nation’s soldiers would no more be within the power of State legislation and State taxation than would an additional salary to any of the nation’s officers, whether civil or military.
*587 And this is founded upon this great political truth and political philosophy, that, under our government, it was not intended that the citizen should be subject, at the same time and for the same object, to the supreme legistive will of both State and nation, and subject to be taxed for the same purpose, at the same time and on the same property, by both To recognize the power of both the State Legislatures and Congress to legislate at the same time on the same subjects, and to tax the citizen for the same purposes, would be to destroy all distinctions between separate powers of the two governments, or the different branches of the same government, and to leave the citizen under the most despotic and oppressive character of government, with the most absolute power, under the plea of taxation, to strip him of all his property.
The people of the United States, in forming the national government for national purposes, and investing it with ample powers for such purposes, and leaving their State governments with the unabridged sovereign powers for all domestic purposes, and still retaining all powers not conferred by the United States Constitution, nor prohibited by it to the States, supposed they had made a great progress in the science and perfection of government, wherein the public welfare could be cared for and protected most efficiently; and, at the same time, they supposed that the individual rights and liberties of the citizen had been secured, not suspecting that they had left the individual subject to the legislative will of both for the same purposes, and that both could impose burdens and taxes for the' same objects at the same time.
It is as incompatible with the genius of our government, and as foreign to its legitimate objects, whether State or national, that the State may legislate and tax for national purposes in aid of congressional legislation and *588 compensation and taxation, as it is that Congress should legislate, compensate, and tax for State purposes; indeed, this is the blending of the legislative will of the two governments, wholly incompatible with the fundamental principles of both State and national constitutions.
The fundamental principle is, that the national Legislature shall enact the national laws, levy and collect the national taxes, and compensate the national employees, whether civil or military; and with this the State Legistures may not interfere, either in thwarting or aiding; that the State Legislatures represent the sovereignty of the people in all things not conferred on the national government nor prohibited to the States, and they are to enact and provide for the domestic affairs of the State and local communities, levy the taxes and fix the compensation for all State employees; and with this Congress may not interfere in any manner, either by friendly or unfriendly legislation, save only so far as may be allowed by the United States Constitution.
Congress may levy and collect taxes for the legitimate purposes of the national government, but not for the purposes of the State governments.
The State Legislatures may levy and collect taxes for the legitimate purposes of the State government, but not for national purposes, save only in a very few specified instances, expressly provided for in the United States Constitution, which do not include these local taxations now under consideration.
In other words, the objects of the two governments being distinct, their respective powers of taxation are confined to the legitimate objects of their respective governments.
The power of taxation in either government for the legitimate purposes of its creation and existence is abso *589 lute, unlimited, and unrestricted ; but this is not an absolute and despotic power in either for any and all purposes.
The purposes for which a specific tax may be levied must therefore be germane to the objects and purposes of the government authorizing it; else it is not a tax within the constitutional purview, but a legislative spoliation.
Had the national government called on the States for their respective quotas of the force wanted, the aspect of a State or local taxation, to aid in the discharge of the duty in furnishing by the State its quota, would have been very different; this would have necessarily involved State legislation and State taxation in raising and officering the troops, according to the 1 Qth paragraph of section 8, article 1, United States Constitution, and, as to these, excluded any legislation on the pai’t of Congress, and left the citizens still subject to but one legislative will according to the penetrating intent of both constitutions.
These Congressional enactments were the exercise of the po wer “ to raise and support armies,” and not the calling out the militia of the States “ to execute the laws of the Union, suppress insurrections, and repel invasions.”
Had the States been called on for their militia, State legislation, to a certain extent, would have necessarily been involved; but, to this extent, legislation by Congress would have been excluded. After the militia of the States had been mustered into the national service, they would cease to be under the control of the State Legislature, but would be under the direction of the national regulations ; and thus both the citizen and soldier would be under the control of but one legislative will at the same time and for the same purpose; State control would cease where the national will would begin to direct.
*590 This, of course, is based on the supposed constitutionality of said acts of Congress authorizing the draft; but if they are not, much less can be any State legislation in aid of their execution.
If the soundness of these principles needed further illustration and confirmation, these would be found in the injustice and inequality of these enactments now under consideration ; for resident and non-resident, the young and the old, the male and the female, the aged soldier of the war of 1812 and the soldier of the war of 1846, w'ho now owe no military service to the government, but who are taxed to support it in common with others; the willing and the unwilling, are coerced into a contribution to exonerate the able-bodied male citizens between the ages of twenty and forty-five years from rendering their military service; and then, to make this inequality and injustice the still more striking, it also embraces those of their citizens who were at the very time discharging their military service in suppressing the late rebellion by substitute.
All these classes are within the taxing provisions of said enactments, and the privilege conferred upon the court to exonerate, at their discretion, persons from this tax, cannot relieve it from this unconstitutional and monstrous taxing power asserted in these several acts over the unwilling.
The unconstitutionality of one of these acts, it is insisted, may be conceded, because the county had been actually drafted, and those owing military service had been designated; therefore this was not a tax for the purposes of the local community, but for a class of that community. Whilst no draft having occurred in the other county, the tax in it was to relieve the local com *591 munity from a burden; but we think this distinction wholly unsupported by reason or analogy.
It was equally a class of citizens only who owed this military service before as well as after the draft; the class, however, would be reduced and made more specific by the process of the draft; but this could not alter the enactment from a community to a class legislation; it is of the same precise character whether before or after the particular number of the given class had been designated by the draft.
It is hardly urged that, had the demanded number from each county been selected by the draft, to make these the more willing to discharge their military service, the other property-holders could be coerced into a large contribution for them; and yet, to coerce the community into a large contribution to obtain volunteer substitutes is virtually, morally, and legally the same thing.
The quintessence of these enactments, when thoroughly analyzed, is simply this: That those persons who patriotically volunteered or responded to the call of their government in its time of need, must be content with the pay and bounties provided by it; but that those who were more tardy in the discharge of this demand, or unfriendly to it, should have a large coerced contribution from the property-holders of their counties, either by way of additional compensation to them personally, if they should go into the service, or for their use if they desired to obtain volunteer substitutes.
There is then no legal distinction between the character and pei’vading principles of these enactments.
Had the Legislature authorized the county courts of Gallatin and Boone to levy a tax to aid some county of Ohio or Indiana to raise its quota of soldiers, and thereby avoid the draft, all would have pronounced this a legis *592 lative spoliation and not a taxation; yet the citizen of Gallatin or Boone was no more a Kentucky soldier than was the citizen of some county of Ohio or Indiana; all alike would be national soldiers, and each, in defending the national government alike, would give incidental protection to all the adhering States; and additional compensation to the soldier from Ohio or Indiana or other State would be as legitimately within the general legislative province and taxing power of the State as would such additional compensation to the national soldier from Kentucky, unless, indeed, it comes within the power to tax the local community.
Nor can this be considered an emolument secured in consideration for public services, but a forced contribution from the community to get volunteer substitutes for those liable to be called on to render the sei-vices in order to relieve them from this measure of legal servitude.
Neither must it be forgotten, in this double taxation, that the national government taxed the citizen on all his income, exempting six hundred dollars, wdiilst the State and county taxed all his property from every resource but three hundred dollars; beside, on many articles, both assessed the same species of property by a specific tax.
It was not then a local tax for the purposes of a local community, but for the benefit of a class of that community.
It was not a tax for the general purposes of the State by way of raising soldiers for her defense, but for the purposes of preventing some of her able-bodied male citizens from becoming national soldiers.
It was not a tax to increase the military power of the United States, but a tax to hire some others to discharge the military service which she demanded from the able-bodied male citizens of these counties, and which they owed and must discharge unless they obtained substitutes.
*593 If it was a tax to pay the national employees, it was beyond the taxing power of the State, as the State Legislature cannot raise revenue to pay salaries to either the executive, judicial, legislative, or military officers or soldiers of the United States.
The national government, being under a constitutional obligation to protect the States against invasion and domestic violence, might well be called on to defray the expenses of State soldiery who had rendered such services ; but the States are under no such guaranty to the United States.
It has an unlimited power to raise its armies by volunteers; and to this end, its power, as to the amount of bounties to be paid and the means to raise the necessary funds by taxation, duties, imposts,<fcc., are unlimited; but there can be but one supreme legislative will on this subject, and that, the national Congress; when this will is embodied in the shape of law, the subject is exhausted until this same will shall change the law.
Nor can such tax be imposed by virtue of section 1, Bill of Rights in our State Constitution, because the “ separate emoluments or privileges ” therein named is not for contemplated service to be rendered, but is allowed when the person shall, by heroic deeds, inventive genius, or great mental endowments, and a life of public virtue, become, in the judgment of the Legislature, a public benefactor.
The case of Booth vs. Town of Woodbury, decided by the supreme court of Connecticut in 1865, is referred to with much confidence in support of this law.
The town of Woodbury having by a vote, in August, 1863, authorized the raising, by taxation, twenty thousand dollars to pay those who should be drafted by the United States, or to assist them to obtain substitutes, they, in *594 November following, obtained a legislative act authorizing said tax, upon its being confirmed by a vote of the town, which it did.
The court said: “In authorizing, under the power to raise armies, a national conscription by the national government, the Constitution so far forth ignores the State governments entirely. * * It is clear, therefore, that the State government, as such, is under no obligation to aid the general government in such an exercise of its powers, and if it attempts to aid, it is wholly a volunteer. % * % * * * * ifc * # The question in hand, therefore, comes to this — 1st. Had the people of this State the inherent right, as part of the legislative power, to appropriate the money of all as a gratuity to the few who should be called at any time by the national government into its independent service? and, 2d. If they had such power, have they restrained the General Assembly from exercising it by any of the limitations of the Constitution ? ”
The court then proceeds to say : “ It must be conceded that the people, if convened and organized as a whole, and acting upon the fundamental principle that what the majority prescribe shall be law, could be under no restraint than that imposed by natural justice; and that the General Assembly, in the exercise of that conferred legislative power, irrespective of the bill of rights, are restrained by the same principles and 710 other.”
The great infirmity of this argument consists in not regarding the States as having delegated away any of their power, unless, by their State Constitutions, they have prohibited its exercise.
There can be no doubt but the people, in their sovereign capacity, in convention, could have conferred upon their Legislature, in their State Constitution, the power to tax *595 and appropriate for any and all purposes; but this is not the status of affairs; having delegated to the national Congress the unlimited right to tax for the purposes and suppoi’t of the national government, shall it be presumed, in the absence of any express constitutional provision, that the State Legislatures have retained the same powers for the same purposes ? The reasoning of the court is highly illogical and unsound, and contrary to the general if not universal rules of construing the powers of the two governments.
The Legislature, being invested with the general powers of raising revenue and of appropriation for the purposes of the State Government, had it, by a general tax, raised, sufficient means and then appropriated it to pay these bounties, most likely it would have been so mixed up with the general and constitutional purposes, that the courts could have had no power over it; but when the Legislature itself separates it from the general and constitutional powers and purposes by making it a special tax for a specific purpose by a special enactment, it thereby enables the courts to judge of its validity.
The supreme court of Pennsylvania, in Speers et al. vs. School Directors of Blairsville, 1865, has wholly ignored this as a constitutional ground, and has sought to uphold the validity of such an enactment, upon the power to delegate to counties and towns the power to tax for the purposes of the local communities and corporations, and its arguments and reasons- are equally unsound, illogical, and violative of the true theory of the rights and powers of the two governments under our complex system.
After discussing several preliminary questions, the court said:
“ The question is therefore narrowed to a single point. Is the purpose in this instance a public one ? Does it con *596 cern the common welfare and interests of the municipality ? Let us see: civil war was raging, and Congress provided, in the second section of the act of 24th February, 1864, that the quota of troops of each ward of a city, town, township, precinct, &c., should be as nearly as possible in proportion to the number of men resident therein liable to render military service.”
Section three provided that all volunteers who may enlist after a draft shall be ordered, shall be deducted from the number ordered to be drafted in such ward, town, &c.; volunteers are, therefore, by law, to be accepted in relief of the municipality from a compulsory service, to be determined by lot or chance.
“ Does this relief involve the public welfare or interest ? # * Military service is the highest duty and burthen the citizen is called upon to obey or bear. It involves life, limb, and health, and is therefore a greater burthen than the taxation of property. The loss or injury is not confined to the individual himself, but extends to all the relations he sustains. It embraces those bound to him in the ties of consanguinity, friendship, and interest to the community, which must furnish support to his family if he cannot, and which loses in him a member whose labor, industry, and property contributes to its wealth and resources, who 'assists to bear its burdens, and whose knowledge, skill, and public spirit contribute to the general good.”
And such is the reasoning, with some variations of language and order, of the supreme court of Illinois in Taylor vs. Thompson, 1866.
These cases assume, but do not prove, because not susceptible of such proof, that it is a burden on a municipality instead of a portion or class of citizens of the municipality; and, having assumed this unsubstantial *597 foundation, proceeds to erect thereon an equally unsubstantial superstructure.
To make the argument worth anything, it is assumed that, owing to the relations to society of the conscript, the obtaining a substitute is a relief to the community as well as to himself; but suppose the substitute is a man largely ramified in the local society, a man of property, of skill and intelligence, and extensively connected; but, being impelled by a strong devotion to the government of his preference, and inspired by a chivalrous determination to defend it, he becomes a volunteer substitute for one not equally ramified, connected, nor having the same skill and intelligence, and one perhaps that feels but little devotion to the government, and may not approve its war or its cause, how is the community relieved ? And, as observation has generally taught us, those who desire to escape a draft are either mercenary in motives, not strongly attached to the government, or disapprove of its war and cause.
Nor can it be perceived why any given number of volunteer substitutes leaving a community should not affect its sympathies, interest, and prosperity quite as much as the same number of conscripts, unless, indeed, the court and law should assume as a fact that such volunteer substitutes are taken from the lower and less influential classes of society, or are obtained from other communities, neither of which can possibly be either a judicial or legal deduction.
In the cases now before us, a large majority of the people of Boone county sympathized with the rebellion and were opposed to its suppression, whilst the sympathies of Gallatin were probably with the government] and this shows the utter absurdity of any assumption *598 by the law or the court as to the objects of such enactments in the absence of the facts.
By the congressional act of 1863, the conscript could exonerate himself from the draft by paying the commutation sum of three hundred dollars to the government. None contend that an involuntary tax could be coerced to raise this commutation fund for the conscript; yet it is hard to perceive any difference in constitutional power to enforce an involuntary tax to provide him a substitute, because the government will no longer take commutation.
Each class alike owed a given measure of military service, and must discharge it individually; the one could do it by paying commutation; the other could not, because this would no longer be received; therefore he must pay it in actual service by himself or substitute; but both were equally individual, and must be paid by individual enterprise, capital, or labor.
Had the government not repealed the law authorizing the reception of three hundred dollars commutation in place of the service, a local taxation to create a commutation fund would have been a tax to pay money for the purposes of relieving the male citizens of the municipality from the military services, and would really have more nearly been a taxation to relieve the local community than one to either pay for volunteer substitutes or to increase the bounty to the conscript, and come more perfectly within the reasoning and arguments of both the Pennsylvania and Illinois courts; yet this would have been a tax to weaken, rather than increase, the military force of the government. Still no court has, by argument or adjudication, attempted to sustain the constitutionality of such laws, and the supreme court of Pennsylvania has held, that “ the citizens *599 of towns could not be taxed to return to volunteer associations the money raised for commutation purposes.”
But because an involuntary assessment cannot be coerced from those who took no part in obtaining said enactments, who never affirmed nor ratified them, and who never accepted the benefits thereof, it does not follow that therefore those who were instrumental in procuring these enactments, who participated and shared their benefits, and who have by acts ratified the same, are also to escape; this would be contrary to the most solid principles of law and exalted equity. By their own voluntary acts they should be considered as estopped from setting up any objection to these statutes or the tax levied by virtue of their provisions. No court of justice should hear them in setting up their own wrong; no court should lend a willing ear to their complaint after being instrumental in borrowing from the community a large amount in sums of from five to one thousand dollars, and inducing gentlemen to borrow from the banks large amounts on their own individual credit, relying upon their promises to return by way of taxation.
And especially should no court hear those who, through the instrumentality of these enactments, were enabled to procure volunteer substitutes, and thereby escape from this dangerous and arduous service. Having voluntarily accepted the benefits of these enactments, they must bear their burdens; before they will be heard to ask equity, they must do equity; before they can be permitted to escape from responsibility, they must honestly return every cent which has been laid out and expended to their use and benefit; and until these things are done, courts of justice should not hear their clamor for justice.
*600 To permit these persons to get the benefit of an outlay of near one hundred and eighty thousand dollars, and then to escape from its payment, is lending the aid of a court of justice to consumznate one of the most stupendous frauds ever perpetrated in the Commonwealth.
The services of these volunteer substitutes were of the most arduous and pez'ilous character, and therefore constituted the most meritorious and valuable consideration; and where money was borrowed or loaned to pay them, the liability to return stands on the same meritorious and valuable consideration; and those who, through their own agency and inducements, procured these enactments, or since have affirmed them and accepted the consideration, cannot be permitted to challenge their validity and at the sazne tizne pocket their benefits.
So far as this class of tax-payers is concerned, these statutes are obligatory, because of their voluntary consent to their provisions and acceptance of their benefits.
There is no valid constitutional objection to that provision of the Gallatin act authorizing the levy of a poll-tax on those liable to be drafted.
There is no valid objection to the levy of the tax of either county on those who have voluntarily affiz’med the act and accepted its benefits; but as the^ issual of the bonds of Boone would render all who owned property in it liable to assessment, although they never consented to said enactment nor accepted its benefits, the bonds should not be issued; but this in nowise affects the rights of the county court to assess those who are liable to refund and repay this vast sum of one hundred and eighty thousand dollars, obtained from their neighboz’s and others, and who have gotten its benefits.
After a careful review of the nizmerous cases in which the right and power of taxation have .come up in many *601 shapes, it is believed that nothing herein conflicts with the true, principles and philosophy of either the State or national Constitutions, nor the great and essential principles of law and equity, as derived from the following :
Golden vs. Grump, 8 Leigh. ( Va.), 120.
Opin. in 4 New Hamp., 565.
Marr vs. Enloe, 1 Yerger (Tenn.), 452.
Thomas vs. Leland, 24 Wend., 65.
Pike vs. State, 5 Pike (Ark.), 291.
Burgess vs. Pugh, 2 Gill, 11.
Waters vs. State, 1 Gill, 302.
Shoio vs. Dennis, 5 Gillman, 405.
People vs. Brooklyn, 4 Comst., 419.
Toledo Bank vs. Bond, 1 Ohio St. R., 622.
O. L. 4* Tr. Co. vs. Debatí, 16 How. U. S., 416.
Town of Guilford vs. Cornell, 18 Bar. (N. Y.), 615.
Guilford vs. Super Chenango Co., 3 Kernan (N. Y.), 143.
Bartlett vs. Mayor, 5 Sanford (N. Y.), 44.
Douglass vs. Mayor N. Y., 2 Denio, 110.
Head's Estate, 21 Penn., 106.
Also other numerous authorities referred to by the counsel for the parties.
The judgment in each case should be reversed as herein indicated, and all persons not liable to- be assessed, according to these principles, should, by proper orders of the county courts, be exonerated, but only such.