## Henry M. Bosworth, Auditor v. Harp.

(Decided June 20, 1913).

### Appeal from Franklin Circuit Court.

1   Pensions—Grant of to Confederate Soldiers—Public Services Rendered By.—A state may grant a pension to Confederate soldiers for public services rendered by them to the state during the Civil war when the state officially declared that it would

remain neutral during the war, and the services of the soldiers were rendered in an effort to maintain the sovereignty and the rights of the state as declared in the state constitution.

2. Pensions—Word "Appropriate" Not Necessary to Act.—It is not necessary that an act should use the word "appropriate" and when it fixes the amount to the paid out of the treasury to the claimant, and directs how it shall be paid, this is sufficient.

3. Pensions—Allowing On Account of Public Services.—An act allowing a pension on account of public services is not invalid because such persons are put upon a different footing from other citizens.

JAMES GARNETT, Attorney General; CHARLES H. MORRIS, Assistant Attorney General, for appellant.

HAZELRIGG & HAZELRIGG, J. W. BLACKBURN, JR., and W. J. STONE for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—
Affirming.

By an act approved March 11, 1912, it was provided that any indigent disabled person who has been a citizen and an actual *bona fide* resident of this State continuously since January 1, 1907, and who actualy served one year or until the close of the Civil War, in the military or naval service of the Confederate States or the widow of such person to whom he was married prior to January 1, 1890 shall be paid out of the State Treasury a pension of $10 a month. No person is entitled to the benefits of the act who is able to earn a support by manual labor or by reason of his knowledge or skill in any profession, trade or craft or who receives a pension from the United States government or any State or foreign government; or removes from the State or is absent therefrom for one year, or has a net income of $300 a year or has property of the value of $2,500, or is living with his wife who possesses property or income sufficient for the suitable support of herself and family including her husband, or whose support is comfortably provided for by reason of a contract or agreement with a person able to provide it, or who by reason of the partial ability to earn a support and income or property, is able to obtain an income equivalent to $300 a year. Provision is made in the act for the allowance of the pension claims. James M. Harp, a resident of Franklin county made application for a pension under the act, and his claim having been

duly allowed he presented his pension voucher properly executed as provided in the act, to the Auditor, who refused to pay it or to issue a warant therefor. He thereupon brought this suit in the Franklin Circuit Court to obtain a mandamus compelling the Auditor to issue a warrant for the amount. The circuit court awarded the mandamus as prayed. The Auditor appeals.

Section 3 of the Constituion among other things provides:

"And no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men except in consideration of public service."

It is insisted that the act is invalid under this section of the Constitution on the ground that the act grants to indigent Confederate soldiers exclusive, separate privileges not granted to other indigent persons. The question to be determined is did the Confederate soldiers render public services to the State of Kentucky within the meaning of the Constitution. In Ferguson v. Landrum, 1 Bush, 593, this court held that separate emoluments or privileges within the meaning of the constitutional provision may be allowed "when the persons shall by heroic deeds, inventive genius, or great mental endowments and a life of public virtue, become in the judgment of the Legislature, a public benefactor." The Massachusetts Supreme Court in answer to an inquiry of the Legislature as to the legality of pensions allowed by that State to Federal soldiers in the Civil war, said this:

"The question asked by the honorable Senate should be answered in the affirmative so far as to say that the general principle referred to—gratuities to Civil war veterans—may have legitimate application to services such as generally have been treated as deserving recognition by the payment of sums of money, the erection of statues or the bestowal of medals, decorations or other badges of honor. In the application of the principle, the question ordinarily will be whether the benefit is conferred as an appropriate recognition of distinguished or exceptional service, such that the dignity of the State will be enhanced and the loyalty and patriotism of the people will be promoted by making it a subject of governmental action." (Opinion of Justices, 190 Mass., 611).

In Judson on Taxation, Sec. 349, it is said:

"Whatever legitimately tends to inspire patriotic sentiments and to enhance the respect of citizens for the institutions of their country and incites them to contribute to its defense in time of war has been held to be a lawful purpose, and such as will justify the exercise of either the power of taxation, or of the power of eminent domain."

Necessarily the matter is one committed to the discretion of the General Assembly, and when the Legislature has declared the use a public one, its judgment will be respected by the courts, unless the use is palpably without reasonable foundation. (U. S. v. Gettysburg, 160 U. S., 688). It is true the services of the Confederate soldiers were directed against the federal government but appellee and his comrades were citizens of a sovereign state. Their claim rests solely upon the ground that they rendered public services to the State of Kentucky. The colonies before the formation of the Union exercised the power of granting pensions or bounties to soldiers. This power has since been exercised by the United States and by many of the States, and that the Legislature has the power in a proper case to grant pensions for public services must now be admitted. To determine whether the Confederate soldiers rendered public services to the State of Kentucky we must put ourselves in the situation of things at the opening of the Civil war, and determine their rights by the circumstances which then surrounded them.

When the Constitution of the United States was formed, each of the thirteen colonies was an independent sovereignty and each jealousy maintained that it had not parted with its sovereignty in forming that Constitution. By the 10th Amendment to the Constitution enacted by Congress at the first session after its adoption, it was provided:

"The powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved to the States respectively or to the people."

From the formation of the government it was maintained by each of the States that being sovereign, it had a right to withdraw from the compact it had made at pleasure; that this right not being prohibited by the Constitution to the States, was reserved by them. The New England States in unequivocal terms asserted this right from 1803 to 1814 with reference to the Embargo Act, the acquisition of Louisiana and the war of 1812.

In 1812 when called on for troops, Massachusetts, Connecticut and Rhode Island each refused, reasserting the sovereignty of the State and insisting that she was not bound to obey until she felt it to be to the interest of her citizens to do so. (New England Federalism, page 523, by Henry Adams.) In 1814 Connecticut, Rhode Island, New Hampshire and Vermont in the Hartford Convention made this declaration:

"In case of deliberate, dangerous and palpable infractions of the Constitution, affecting the sovereignty of a State and the liberties of the people, it is not only the right, but the duty of each State to interpose its authority for the protection in the manner best calculated to secure that end."

Nowhere was this sentiment stronger than in Kentucky. By section 1 of the Resolutions of 1798 it was declared as follows:

"Resolved that the several states composing the United States of America, are not united on the principle of unlimited submission to their general government; but that by compact under the style and title of a Constitution for the United States and of amendments thereto, they constituted a general government for special purposes, delegated to that government certain definite powers, reserving each State to itself, the residuary mass of right to their own self government; and that whensoever the general government assumes undelegated powers, its acts are unauthorized, void, and of no force: That to this compact each State acceded as a State, and is an integral party, its co-States forming, as to itself, the other party: That the government created by this compact was not made the exclusive or final judge of the extent of the powers delegated to itself; since that would have made its discretion, and not the Constitution, the measure of its powers; but that as in all other cases of compact among parties having no common judge, each party has an equal right to judge for itself, as well of infractions as of the mode and measure of redress."

The principle announced in this resolution was steadily maintained in Kentucky from that time until the breaking out of the Civil war. It was recognized from time to time in the platforms of the leading political parties and by the General Assembly. Its principle was imbedded in the Constitution adopted in 1851. Sec. 4, Bill of Rights. In his life of Daniel Webster, page 172, Henry Cabot Lodge, for many years a prominent United States Senator, says:

"When the Constitution was adopted by the votes of States at Philadelphia and accepted by the votes of States in popular convention, it is safe to say that there was not a man in the country from Washington and Hamilton on the one side to George Clinton and George Mason on the other, who regarded the new system as anything but an experiment, entered upon by the States and from which each and every State had the right peacefully to withdraw, a right which was very likely to be exercised."

In October, 1912, General Charles H. Grosvenor, of Ohio, a gallant soldier in the Federal army, and for many years a leader in Congress, in a speech made to his comrades of the Army of the Cumberland in Chattanooga said:

"Now, if there is a Confederate soldier in the house, I want him to stand up. Figuratively speaking, I am going to defend him. You Confederate soldiers did not believe that you were compelled to stay in the Union. Lee, Jackson, Calhoun, and other great men, of the South, believed the same on that question. They did what they believed to be right. They saw the Constitution as it was adopted. Who is here to call them criminals? Certainly, not I."

With these facts in mind let us look briefly at the historical facts as to the attitude of Kentucky at the opening of the Civil war. Kentucky was a slave holding State. In her Constitution adopted in 1851, it was declared:

"The right of property is better and higher than any constitutional sanction, and the right of the owner of a slave to such slave and its increase, is the same and as inviolate as the right of the owner of any other property whatever."

When the Southern States seceded, and Kentucky was called upon by the Federal government to furnish troops for the war, she declined, believing that the Federal government had not the constitutional right to coerce them back into the Union. The House of Representatives adopted the following resolution:

"Resolved by the House of Representatives, that this State and the citizens thereof should take no part in the Civil war now being waged, except as mediators, and friends of the belligerent parties; and that Kentucky should during the contest occupy the position of strict neutrality.

Resolved that the act of the Governor in refusing to furnish troops or military force upon the call of the executive authority of the United States, under existing circumstances, is approved."

The General Assembly provided the sum of $1,000,-000 for the expenses of arming and disciplining the militia; $750,000 to be expended for arms; one-half to be issued to the State guard and the other half to the home guards. The State guard was to be at once placed in camp; the home guards were to be held in reserve; and it was provided that "neither the arms nor the militia were to be used against the government of the United States nor the Confederate States, unless in the sole defense of the State of Kentucky." In a few months the State was invaded both by the Confederate and the Federal troops, and soon it became evident that Kentucky's position of neutrality could not be maintained. The result was that those who espoused the cause of the Union went to the Federal army, and those who maintained the right of the State as a sovereign to control her own matters, went to the Confederate army. The Civil war was not a mere insurrection against an existing government; it was a contest between two sovereignties. Up to that time in the Southern States especially, it was maintained that the citizen owed his first allegiance to his State, and the war was the result of what these men believed to be an unconstitutional effort to destroy the sovereignty of the several States, and take from them their right to control their own local matters.

The Civil war is often spoken of as the war of secession, as though secession was the cause of the war. But the cause of the war was deeper than that. It was the irrepressible conflict between two independent sovereignties, and the cause of the conflict with slavery. The Southern States maintained that they had a right to regulate their own internal affairs, and that these were beyond the control of the national government. In 1859 John Brown made his raid upon Harpers Ferry in an effort to incite an insurrection of the negroes for the murder of the peaceful inhabitants of Virginia. This deeply stirred the South for the defenseless women and children would be the first to suffer. While John Brown's effort failed, he was lauded as a hero and a patriot by many of the extremists of the North, and so prevalent was this sentiment that the Southern people became alarmed. The decision of the United States Supreme

Court in the Dred Scott case which had been rendered a few years before was openly assailed, and such declarations as the following were common:

"There is a higher law than the Constitution which regulates our authority over the domain. Slavery must be abolished and we must do it."—W. H. Seward.

"The Union is a lie. The American Union is an imposture, a covenant with death and an agreement with hell."—William Lloyd Garrison.

"The fugitive-slave act is filled with horror—we are bound to disobey this Act."—Charles Sumner.

"The Union is not worth supporting in connection with the South."—Horace Greley.

"The times demand and we must have an anti-slavery Constitution, an anti-slavery Bible and an anti-slavery God."—Anson P. Burlingame.

Without the question of slavery no Southern State would have seceded, and without that question no army could have been mustered in the North to carry on the war against the South. The trouble had been brewing for a number of years and the inevitable had at last come. The question had to be settled by arms. It is true that might makes right, but it does not follow that might is right. The Southern soldier fought for a principle, the right of each State to regulate its local affairs—a principle that everybody conceded when the Constitution of the United States was formed and without which that instrument could never have been adopted. The Kentucky soldiers who fought in the Confederate army fought to maintain this principle for the State of Kentucky, and while they lost in the wager of battle, Kentucky has always recognized that they fought for a principle and were rendering public services to their State. In every section of the State after the close of the war, it was the pleasure of the people of Kentucky to advance to office the Confederate soldiers; for many years they filled the more important offices of the State, and literally controlled the State's affairs. The Legislature made appropriations for monuments to distinguished Confederate soldiers. In 1902 it established a home for Confederates, and this has been since maintained at the expense of the State, an appropriation of $175 a year being made for each inmate. In 1904 it appropriated the sum of $2000 to mark the Confederate graves at Perryville, Kentucky. Monuments have been erected to Generals John C. Breckenridge, John H. Morgan and other distinguished

Confederates. None of these appropriations have ever been questioned or assailed; and they show a settled policy by the Legislature acquiesced in by the people of the State to regard the Confederate soldiers as having rendered public services to the State of Kentucky.

In the year 1850 the Legislature of Kentucky provided for the placing of a block of Kentucky marble in the Washington monument bearing this inscription:

"Under the auspices of Heaven and the precepts of Washington, Kentucky will be the last to give up the Union."

Kentucky did not secede. Virginia was the last State to secede, and it is almost certain that Virginia too would not have seceded but for John Brown's cold blooded effort to bring about a massacre of the women and children of the State, and the spirit with which much of the north regarded his undertaking. But all of the secession ordinances were invalid; for in legal effect as was afterwards held, all the secession ordinances were void. So Kentucky's position was not substantially different from that of the other Southern States. Over fifty years have passed since the breaking out of the Civil war. The passions engendered by the struggle have subsided and all have learned to realize that the country could not continue part free and part slave holding. Kentucky no less than the other States rejoices in the prosperity and greatness of our reunited country. All now recognize the fact that He who does all things well ruled in that conflict bringing about His eternal purposes, and all now see that the usefulness of this country and its power for good would have been greatly curtailed if the struggle had ended otherwise than it did. As passions have subsided those on each side have perceived the patriotic motives prompting the other, and have learned to honor their sincerity and devotion to duty. Every Englishman regards the common heritage of the race, the heroism and self-sacrifice of the combatants on either side in the war of the Roses, and the same sentiment is fast coming into the hearts of all Americans as to all those who endured hardship and hazarded their lives for the cause they deemed just in our Civil war. So it is that in the General Assembly the bill before us was passed by a practically unanimous vote, all political parties agreeing upon it.

The war wrought a revolution. The Union as the fathers understood it was merged in the nation. State sovereignty as they understood it passed out of sight.

The doctrine of the resolutions of 1798 that the Federal government was not the final judge of the extent of its powers, and that each State had an equal right to judge for itself as well of infractions as of the mode and measure of redress, which was universally maintained at that time and for the next fifty years, was by the war determined to be no longer true. But the soldiers who fought for this principle to maintain the rights of their sovereign State, no less rendered public services to their State than the men who served in the Federal army to rid the country of the blight of slavery. The Kentucky soldiers in the Federal army served faithfully the sovereign to whom they deemed they owed their first allegiance and they have been provided for by the sovereign they served. The Kentucky soldiers in the Confederate army served no less faithfully their State, the sovereign to whom them deemed they owed their first allegiance, and that sovereign may with equal propriety honor their self-sacrifice, gallantry and patriotism by protecting them in their age from want.

Section 230 of the Constitution provides:

"No money shall be drawn from the State Treasury except in pursuance of appropriations made by law."

It is insisted that the act is void because no appropriation is made as provided by this section. But it is not necessary that an act of the Legislature should use the word "appropriate." The act directs that the vouchers issued to the pensioners shall be paid out of the Treasury upon the warrant of the Auditor and the Auditor is directed to issue his warrant to each person for the amount of his claim. This is an appropriation within the meaning of the Constitution. The General Assembly has for years made similar appropriations. The appropriation to the Confederate Home is made in the same way, $175 being allowed for each inmate. Allowances in the same way are made for the support of the insane asylums and other institutions of the State.

Section 171 of the Constitution provides:

"Taxes shall be levied and collected for public purposes only."

But a tax is levied for public purposes where the money is used to pay a pension granted in consideration of public services. For the same reason the act is not a special law. Indigent Confederate soldiers are placed upon a different footing from other indigent persons in the State because of the public services rendered by them.

Dean Shaler of Harvard University, himself a gallant Federal soldier, says this of one Kentucky brigade:

"On May 7, 1864, this brigade, then in the army of General Joseph Johnston, marched out of Dalton, 1,140 strong, at the beginning of the great retreat upon Atlanta before the army of Sherman. In the subsequent hundred and twenty days, or until September 3, the brigade was almost continuously in action or on the march. In this period the men of the command received 1,860 death or hospital wounds, the dead counted as wounds, and but one wound being counted for each visitation of the hospital. At the end of this time there were less than fifty men who had not been wounded during the hundred and twenty days. There were 240 men left for duty, and less than ten men deserted. A search into the history of warlike exploits has failed to show me any endurance to the worst trials of war surpassing this. We must remember that the men of this command were at each stage of their retreat going farther from their firesides. It is easy for men to bear great trials under circumstances of victory. Soldiers of ordinary goodness will stand several defeats, but to endure the despair which such adverse conditions bring for more than a hundred days demands a moral and physical patience, which, so far as I have learned, has never been excelled in any army."

This is given only as an illustration. Similar things may be said of the other Kentucky troops. So long as the courage of the battlefield or the risking of one's life for his country is honored and it is the policy of the State to promote the loyalty and patriotism of the people by fostering the martial spirit, such services constitute a reasonable basis for classification. The honor due to the true and the brave is not limited to those who are successful in the struggle. Greece still honors the Spartans who defended the pass at Thermopylae. The names of Wallace and his comrades are yet household words in Scotland. They who died at the Alamo are honored of all Americans. The state may show that the republic is not ungrateful to these men not only by erecting monuments to them when dead or placing flowers on their graves, but it may with equal propriety gladden their hearts while living and in their infirmity give them bread.

Judgment affirmed. Judge Lassing dissents.

Opinion by Judge Lassing—Dissenting.

When the act under consideration was adopted, there was in force in this State a general law making provision for the support of all indigent and dependent Confederates and their widows. Kentucky Statutes, Chapter 22-a and amendments thereto. The act before us is not general in its application, and is in direct and open violation of section 59, sub-section 29, of the Constitution, which provides: " * * *where a general law can be made applicable, no special law shall be enacted."

The Legislature has the undoubted right to classify persons to be affected by a Legislative act, but such right is always subject to the limitation that the classification must be reasonable and natural. The classification here attempted is neither reasonable nor natural, but is arbitrary and unjust. Thousands of our citizens, equally deserving and with less means of support than many of those provided for in this act, are denied its benefits. It is class legislation of the worst type.

But, brushing aside the plain provisions of the constitution, the validity of the act is upheld upon the ground that they, who are provided for therein, have rendered such public service as that they should be provided for. I concede that the Confederate soldiers were brave men and that they fought with a courage and determination that challenged the admiration of the civilized world, but, by the arbitrament of the sword, every principle for which they contended was decided against them. The integrity of the Union was preserved. While theirs was a brave, gallant, and heroic fight, I cannot bring myself to believe that, in their struggle for the lost cause, they rendered either the National or the State Government a "public service" within the meaning of these words as found in the bill of rights.

When Legislatures, swayed by sentiment, make reckless appropriations in violation of the plain provisions of the Constitution, the people look to the courts for relief against the oppressive and unjust taxation which such legislation produces; and courts, much as they may sympathize with the condition of those who are made the beneficiaries of such legislation, should hesitate to give to the plain language of the Constitution a strained construction in order to uphold such legislation. The rights of those, not benefitted by the act, are entitled to the court's protection as much as the rights of those who are.

I have been unable to find any case where one, whose efforts were directed toward disrupting the government, has been declared to have rendered a "public service" to that government. The construction which the majority opinion gives the words "public service" as found in the bill of rights, is certainly at variance with the generally accepted meaning of these words, and I am unwilling to adopt such construction and thereby add at least a half million dollars annually to the already heavy burden of our tax-ridden people. For this reason I dissent.