## Miller, Com'r of Finance, et al. v. Quertermous, Com'r of Welfare.

May 16, 1947.

W. B. Ardery, Judge.

Lilburn Phelps for appellants.

Eldon S. Dummit, Attorney General, and Ben B. Fowler, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Affirming.

John Quertermous, Commissioner of Welfare, instituted this action for a mandamus against the defendants, Clarence Miller, Commissioner of Finance, and T. W. Vinson, Treasurer of the Commonwealth of Ken-

tucky, directing them to issue warrants and checks for the payment of the necessary, ordinary and recurring expenses of the Division of Hospitals and Mental Hygiene, and of the Division of Corrections of the Department of Welfare. General demurrers to the petition filed by each of the defendants were overruled. Defendants declining to plead further, the court entered judgment in accordance with the prayer of the petition. The defendants prosecute this appeal.

There are involved in this action: (1) An appropriation for the Division of Hospitals and Mental Hygiene, and (2) an appropriation for the purpose of paying the ordinary recurring expenses of operating the charitable institutions and Darnall Hospital. The objects of the appropriation were the Eastern State Hospital, Central State Hospital, Western State Hospital, the Kentucky Training Home at Frankfort, the Kentucky Children's Home at Lyndon, the Kentucky State Hospital, known as Darnall Hospital at Danville, the Houses of Reform at Greendale, State Reformatory at La Grange, State Penitentiary at Eddyville, and the Women's Prison at Pewee Valley.

The 1946 session of the General Assembly in its final appropriation bill reduced the requested budget of the Commissioner of Welfare and appropriated an amount sufficient in its judgment to meet the needs and requirements of the Department. The reduction thus made by the General Assembly and the appropriation as finally provided, would most likely have been sufficient to have met the needs of these institutions had there not followed an unanticipated and unforeseen rising cost of materials and supplies. It is common knowledge that near the beginning of the present fiscal year the price control system, which had been in effect during the war, was eliminated with the consequent result of a rising cost of living throughout the remainder of the fiscal year. As a result there has arisen a critical emergency—as a matter of fact a life or death crisis. The Department of Welfare is entering the present month with only a sufficiency of funds to provide the necessities for the inmates of these institutions up and until about May 15, 1947. The emergency fund allocated to the Governor, who may solely control such funds, was provided with only $50,000, and this limited fund, even

though the Governor should expend the entire amount to cover the anticipated deficits of these institutions, could not begin to meet the requirements. There are approximately 11,500 inmates of these institutions. No one would suggest, nor has anyone the authority to release the wards of the State. As wards of the State, it is the duty and responsibility of the State to provide them the necessities of life. This is an inexorable necessity coupled with an inescapable responsibility. Since this is a claim solely for the purpose of feeding, clothing, housing and providing for the attendants and guards for the wards of the State, no claim is entitled to a higher priority. It is such an emergency as will not permit the State to remain in the cold waters of selfish calculation, nor escape into masked passivity. Faced with an urgent necessity and critical emergency, and with no possible alleviation of the imperiled situation through recourse to the Governor's emergency fund due to the insufficiency of funds there, it became obviously imperative that the Department look elsewhere. It is fortunate that we have an unappropriated surplus in the general fund in excess of fifteen million dollars.

Section 171 of the Constitution provides: "Taxes shall be levied and collected for public purposes only." This great surplus in the general fund is there for public purposes. See Bosworth v. Harp, 154 Ky. 559, 157 S. W. 1084, 45 L. R. A., N. S., 692, Ann. Cas. 1915C, 277. True, Section 230 of the Constitution provides: "No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law." But Section 254 provides: "The Commonwealth shall maintain control of the discipline, and provide for all supplies * * *." When these two sections are read in pari materia, it is obvious that since the care of the State's wards is an unquestioned object of public duty, the obligation of providing for them was not imposed alone upon our General Assembly. It is true that appropriations for expenditure of public monies is a matter appropriate for Legislative consideration. But 230 of the Constitution, which provides that no money shall be drawn from the State Treasury except in pursuance of appropriations made by law, would not necessarily be so narrowly limited as to mean that the Legislature has exclusive control. The power to appropriate by the Legis-

lature was not for an end in itself but merely to provide a safer and more expedient means of accomplishing an end. Assume on the other hand that there was a Legislative refusal to appropriate. Would there be such impotence on the part of the State as to have to submit to the inevitable and allow this hopeless, despairing group to perish? To accept such finality would mean to say that the State's moral sense of responsibility is either nonexistent or atrophied. The same may be said in the event that a well meaning Legislature honestly but erroneously estimated the amount necessary for carrying on this important governmental function.

In the case of Breathitt County v. Cockrell, 250 Ky. 743, 63 S. W. 2d 920, 92 A. L. R. 626, this court held that it was the duty of the Legislative body to provide revenue. In the case of Fulton County Fiscal Court v. Southern Bell Tel. & Tel. Co., 285 Ky. 17, 146 S. W. 2d 15, we held that the underlying principle of the Constitution was to the effect that necessary governmental expenses must be met by a county even though it results in exceeding the limitation of indebtedness of Section 157 of the Constitution.

In the case of Rhea v. Newman, 153 Ky. 604, 156 S. W. 154, 157, 44 L. R. A., N. S., 989, it was pointed out that Section 171 of the Constitution requires the General Assembly to provide an annual tax which shall be sufficient to defray the ordinary expenses of the State. This court said:

"But should the Legislature fail in its plain duty under section 171, by refusing to levy any tax whatever, should the state cease to govern? Would its courts of justice and its penal and charitable institutions close their doors? Would its peace officers, for want of support, be compelled to turn the state over to the passions of the lawless and vicious elements? Would the Legislature be incapable of incurring the expense of a session, and therefore be unable to meet, even though the meeting were called for the sole purpose of levying the necessary tax to pay the running expenses of. the state? No one would hesitate to answer these questions in the negative."

In the case of Talbott v. Burke, 287 Ky. 187, 152 S. W. 2d 586, 588, after discussing the fundamental nature

of the function of the county tax commissioner, and pointing out the clear intent of the Legislature, the court summed up the situation as follows:

"Here is an important and necessary governmental function requiring money with which to carry it on, and the intention of the legislature to supply that money, but in fact a bare shelf in the cupboard resulting from an erroneous estimate of the amount which would be needed."

The court directed the Treasurer to make the requested payment.

We are justified in assuming that the Legislature was fully cognizant of its obligation to make such appropriation for the care of these institutions and inmates. The intention so to care for them is evidenced by the appropriation made. The fact that an unanticipated rising cost of living later shows the estimate to be erroneous, in no way operates to destroy that proper intention, nor could it in any way be justifiable grounds for criticism. A great untouched surplus of public funds, collected for public purposes, is on hand. An unexpected and unanticipated emergency requiring more than emotional gestures confronts us.

All of the above, together with the unquestioned public duty to care for these wards of the State, constrain us to conclude that the court below properly directed the defendants as above stated.

Wherefore, the judgment is affirmed.