**Richard GRISE et al., Appellants,**

**v.**

**Bert COMBS, Governor et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 1, 1961.

Paul R. Huddleston, Bowling Green, for appellant.

John B. Breckinridge, Atty. Gen., Troy D. Savage, Asst. Atty. Gen., for appellee.

MOREMEN, Judge.

Once again we are presented with an appeal of a suit which attacks the constitutional validity of acts authorizing payment of a bonus to veterans of the armed services. A résumé of prior acts and a summary of our opinions concerning them may bring into focus a picture of the issues which we are now required to decide.

The General Assembly (Chapter 48, Acts of 1958) authorized submission to the electorate of the question as to whether a veterans' bonus should be paid. At a general election held on November 3, 1959, a ma-

jority of the voters approved such a payment.

In Stovall v. Gartrell, Ky., 332 S.W.2d 256, 259, the validity of the act of 1958 was vigorously attacked and while many questions were decided the principal issue was whether the act was in violation of federal or state constitutions. It was contended by amicus curiae that neither the legislature nor the electorate could authorize a veterans' bonus because it was violative of Article I, § 8 of the United States Constitution which delegates to the federal congress exclusive power to raise and support armies, and a veterans' bonus granted by a state government was an unlawful invasion of that field. We held:

"This principle obviously has no application here. The wars are over, and the armies participating therein were raised and supported by the federal government. The status of the veteran is not that of a soldier in the United States Army, but a Kentucky citizen the legislature and the people deem it proper to recognize because of his past service. This grant of compensation constitutes a recognition of a *moral obligation* to reimburse Kentuckians for losses suffered by reason of military service. It has nothing whatever to do with raising and supporting armies. (our emphasis)

"Amicus Curiae also cites People v. Westchester County National Bank, 231 N.Y. 465, 132 N.E. 241, 15 A.L.R. 1344. As we read that case the New York court did not determine that the attempt of the state to give a soldiers' bonus was an invasion of federal power, but decided that the state has no legal obligation to a veteran.

"We do not understand that amicus curiae is raising the question of whether or not the granting of a veterans' bonus by the legislature or the people is a legitimate public purpose. Since the problem is presented, however, by his reliance upon the Westchester Bank case, just cited, and since it is important to our determination of the true nature of the proposal submitted to the people (to be hereafter discussed) we will pass upon it.

"The problem was apparently settled by the decision of this Court in Bosworth v. Harp, 154 Ky. 559, 157 S.W. 1084, 45 L.R.A.,N.S., 692. Though that case was rather extreme and involved patriotic considerations growing out of the Civil War, we think the broad principle there recognized is applicable here. That is, the legislature may in its wisdom properly determine that past military service has changed the status of the veteran to such a disadvantage that it is within the scope of a proper public purpose to recognize a moral obligation of the state by granting to the veteran, not a donation, but what Mr. Justice Cardozo has adequately described as 'requital'. This expression was used by Judge Cardozo in his dissenting opinion in the Westchester Bank case, we have above discussed, and we are inclined to follow his dissent rather than the majority opinion in that case."

Thus, it was held that the payment of a bonus to a veteran for past services served a public purpose, not in violation of either the federal or state constitution.

The General Assembly (Chapter 15, Acts of 1960) enacted specific legislation pursuant to the authorization granted by the vote of the people on November 3, 1959. This act set forth that a veteran in order to receive a bonus payment must (1) have been a resident of the Commonwealth for at least six months before he entered the armed services and (2) have been a resident on November 3, 1959, the date the electorate approved the bonus proposal.

The enactment was challenged by two suits which were consolidated. This court held in Watkins v. State Property and Buildings Commission of Kentucky et al., Ky., 342 S.W.2d 511, and in the first suit

between these parties, Grise et al. v. Combs et al., that the General Assembly did not act unreasonably in generally classifying or confining qualified veterans to those who were residents of this state at the time of electoral approval. The limitation as to residence for six months prior to the entrance into the armed services was also tacitly approved.

In the opinion it was reiterated that the legislature had the right to adopt bonus legislation as a proper public purpose and it was again concluded that neither the federal nor the Kentucky constitution was violated. As to the power of the legislature to generally classify the veterans who may receive bonus payments, it was said:

"Since the payment of a veterans bonus is to rehabilitate, in a broad sense, present citizens of Kentucky, we think the General Assembly did not act unreasonably in generally classifying or confining qualified veterans to those who were residents of the State at the time the electorate approved the payment of a bonus. Substantially all legislation involves classification of some sort, and the classification here is reasonably relevant to the purposes of the Act. Payment of public funds to citizens occupying a special status by virtue of prior military service during time of hostilities effects a reasonable public purpose."

After the opinion in the foregoing consolidated cases, the General Assembly met in extraordinary session in September 1960, and amended the former act and defined a "qualified veteran" as one (with other attributes), "(a) who was a resident of the Commonwealth at the time of entry into active service in the armed services and for at least six months prior thereto; and (b) who has not received a bonus or like compensation from another state."

It may be noted that the division of opinion by members of the court in the consolidated cases was not caused by a divergence of views concerning the constitutional right of the legislature and the electorate to authorize the payment of a bonus. The split decision resulted from a difference of opinion as to whether the legislature had made a proper classification in carving out of the general class of those who served, veterans who were not residents on November 3, 1959. The majority opinion justified the payment to resident veterans on the ground that the purpose of the original bonus act was "to rehabilitate, in a broad sense, present citizens of Kentucky," and concludes, "we think the General Assembly did not act unreasonably in generally classifying or confining qualified veterans to those who were residents of the State at the time the electorate approved payment of a bonus."

The concurring opinion recognizes that "under fundamental constitutional principles it is the duty of the courts to sustain whatever classifications may be imposed by the legislature in implementing the stated choice of the electorate, so long as they have some reasonable bases." Still this opinion interprets the Gartrell case to mean that the basis on which we sustained the bonus is that the veterans residing in Kentucky are a segment of our population which can be classified or singled out for payment of a benefit out of public funds as an adjustment for a presumed economic disadvantage or setback suffered by each of them from a common cause. That the "moral obligation" of the state (see first quotation in this opinion) is to ameliorate the changed *status* wrought upon its citizens by their military service, not to pay for the service.

If it is true that, constitutionally, a bonus may be paid only as a welfare measure in order to rehabilitate or to improve the changed status caused residents by their military service, we see no reason that a discussion of classification as to resident and non-resident veterans was required in any of our prior opinions, because there could be only one group eligible—namely, resident veterans.

We believe that the original premise assumed in the Gartrell case that "the legis-

lature may in its wisdom properly determine that past military service has changed the status of the veteran to such a disadvantage that it is within the scope of a proper public purpose to recognize a moral obligation of the state by granting to the veteran, not a donation, but what Mr. Justice Cardozo has adequately described as 'requital'" is sound and is supported by the constitution.

Section 3 of the constitution reads in part:

"And no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services."

The important words are "public services." The first definition we have found was in Ferguson v. Landram, 1 Bush 548, 593, 64 Ky. 548, 593, to-wit:

"Nor can such tax be imposed * * * because the 'separate emoluments or privileges' therein named is not for contemplated *service to be rendered,* but is allowed when the person shall, by heroic deeds, inventive genius, or great mental endowments, and a life of public virtue, become, in the judgment of the Legislature, a public benefactor."

In Bosworth v. Harp, 154 Ky. 559, 157 S.W. 1084, 1085, 45 L.R.A.,N.S., 692, the court accepted the foregoing definition in a case which involved the following facts: An act of the General Assembly of 1912 granted pensions to indigent confederate soldiers and it was attacked on the ground that it violated § 3 of the constitution. The court squarely faced the question and decided that the service rendered to the state by the confederate soldiers was public service, and recognized the power of the legislature to determine what is and what is not such a service, saying:

"Necessarily the matter is one committed to the discretion of the General Assembly, and, when the Legislature has declared the use a public one, its judgment will be respected by the courts, unless the use is palpably without reasonable foundation. U. S. v. Gettysburg [Electric R. Co.], 160 U.S. 668, 16 Sup.Ct. 427, 40 L.Ed. 576."

It may be noted that while the act applied to indigent disabled confederate veterans, the case was not decided upon the welfare theory, but upon the ground that a public service had been rendered.

This long discussion may be recapitulated as follows: 1. In the Gartrell case and in the first appeal by parties to this case it was held that the tax required to be levied was for a "public purpose" and the requirements of Sec. 171 of the constitution were satisfied. 2. In the Gartrell case it was held that the designation of veterans as distinguished from those who did not serve was reasonable classification. 3. In the original opinion in this case it was decided that the general classification of veterans who served from Kentucky could properly be subdivided into divisions of those who were resident in Kentucky on November 3, 1959, and those who were non-resident, paying only residents. 4. In this case we decide (a) that the two subdivisions may again be joined to form a proper integral classification, and (b) as in the Gartrell case, military is a public service for which a grant of separate emoluments may be made under Sec. 3 of the constitution.

We believe appellants' argument that the state has invaded a field preempted by the Congress of the United States was answered in the Gartrell opinion.

Judgment affirmed.

MILLIKEN, PALMORE and WILLIAMS, JJ., dissenting.

WILLIAMS, Judge (dissenting).

This Court has heretofore expressed the opinion that a veterans' bonus might legally be paid. Stovall v. Gartrell, Ky., 332 S.W.2d 256. Following that in the concurring opinion of Judge Palmore in Wat-

kins v. State Property and Buildings Commission of Kentucky, Ky., 342 S.W.2d 515, it was said:

"The basis, threadbare as it is, on which we sustain the bonus is that the veterans residing in Kentucky are a segment of our population who can be classified or singled out for the payment of a benefit out of public funds as an adjustment for a presumed economic disadvantage or setback suffered by each of them from a common cause. Stovall v. Gartrell, misconstrued in the dissenting opinion, was carefully worded to convey this thought. The 'moral obligation' of the state is to ameliorate the changed *status* wrought upon its citizens by their military service, not to pay for the service. An analogy might be drawn to the purpose presumed to be achieved through the various types of public assistance wherein residence is one of the conditions of eligibility. See also the strict residence requirement (KRS 206.020) of the Confederate veterans pension law. So we postulate that his military service has had an economically crippling effect on each veteran, the disadvantage of which, though it may not be visible, presumptively continues extant, representing an inequity among our citizens that the legislature has a right to recognize and broadly adjust. Precise adjustment on an individual basis would, of course, be impossible."

The payment of money to those in a certain class for a recognizable public purpose (rather than giving aid in some other form) does not violate either section 3 or section 171 of the Kentucky Constitution. In Bowman v. Frost, 289 Ky. 826, 158 S.W.2d 945, we recognized the legislature could appropriate money to the needy blind, not as a mere private gift or bounty, but in discharge of an inherent duty of the Commonwealth to assist a class of unfortunates.

Similar aid to dependent children and the underprivileged has been held constitutional on the ground of a social obligation to promote the general welfare in Meredith v. Ray, 292 Ky. 326, 166 S.W.2d 437, and Jefferson County Board of Education v. Goheen, 306 Ky. 439, 207 S.W.2d 567. The payment of public funds to needy individuals is recognized as a proper public purpose in Duncan v. Smith, Ky., 262 S.W.2d 373, 42 A.L.R.2d 754. Similarly, payment of wages to convicts (though not authorized under section 3 of the Constitution) was upheld on this ground in State Board of Charities and Corrections v. Hays, 190 Ky. 147, 227 S.W. 282.

While veterans cannot be placed in quite the same class as those considered in the foregoing cases, compensation to them is really an extension of that doctrine. (It is common knowledge that the need for economic aid to unemployed veterans has played a significant part in the promotion of this legislation.)

It may be observed that the legislature has granted special concessions and exemptions to veterans by other acts. These are: KRS 61.370 (Re-employment of veterans); KRS 64.300 (Exemption from payment of notary fees); KRS 142.020 (Exemption from poll tax); KRS 164.480 (Scholarships); and KRS 213.190 (Exemption from payment of fees for vital statistics records). No one would contend that these statutes were conceived as granting privileges and emoluments for special public services under section 3 of the Constitution. In fact they constitute a clear recognition of the changed economic status of the veteran and this type of law enacted for their benefit may rightfully be considered as promoting the general welfare of the entire citizenry.

We come now to the question of the validity of the Amendment (Chapter 1, Acts Extra Session, 1960). This legislation was enacted for the sole purpose of extending benefits to all veterans of four major wars (and the dependents of deceased veterans) regardless of whether or not they had resided in Kentucky after their induc-

tion into the armed services. The only pertinent condition of payment was the fact that the veteran had been inducted from Kentucky and had resided here for six months prior thereto.

At this point it is important to point out that the Kentucky "bonus" law is without precedent. Had it been an act similar to those considered in other jurisdictions, passed shortly after the engagement of the United States in a major military conflict and limited to the veterans of that conflict, the problems presented, and particularly those with respect to residence, would have a different hue. The scope of the Kentucky legislation, from an objective standpoint, staggers one's credulity. It covers every veteran inducted from Kentucky into the United States armed forces for service in any one of four wars, beginning with the Spanish American War fought in 1898. Such a wholesale appropriation calls for careful scrutiny. On what possible ground can we sustain this payment of tax money to a person who is not a citizen of this state and has not resided in this state for 15, 40 or 60 years?

It is clear that such compensation cannot be upheld as a gift, bounty or reward *for federal military service*. This is the only conceivable legal ground upon which the benefits of the Act could be extended to citizens of other states, and that is the basis for appellants' contention that Article 1, Section 8 of the United States Constitution would be violated. We have stretched constitutional concepts almost to the breaking point in sustaining payments to Kentucky citizens. This was not on the theory that Kentucky could pay for military service as such, but only on the ground that the general welfare of Kentucky is or will be promoted by such payments and the Commonwealth as a whole will realize a public benefit therefrom. See Carman v. Hickman County, 185 Ky. 630, 215 S.W. 408, and Industrial Development Authority v. Eastern Kentucky Regional Planning Comm., Ky., 332 S.W.2d 274. While compensation to Kentuckians may promote the present and future general welfare from the standpoint of aid to the recipients, we cannot discern in what respect the payment of compensation to non-residents could by any stretch of the imagination foster such a public purpose of Kentucky.

Take an example that could well be presented under the Amendment. A veteran of the Spanish American War, inducted into the army in 1898 from Kentucky, after the war moved to California where he subsequently died, leaving a widow who is now and always has been a resident of that state. How could a cash payment to her possibly promote any public interest of Kentucky? If this example appears extreme, it doubtless would be duplicated many times with respect to veterans of World War I, which terminated over 40 years ago. Even World War II ended more than 15 years ago. The same difficulty is apparent if non-resident veterans of these wars had survived, and the payments were made directly to them. Kentucky simply could have no recognizable interest in economically aiding those citizens of other states. If nothing else, any present public benefit realizable from the Amendment is so "exceedingly remote" as to fall without the scope of a public purpose under sections 3 and 171 of our Constitution. See Barnes v. Adams, Ky., 305 S.W. 2d 754.

It is common knowledge that after the enactment of the original Act, which limited compensation thereunder to those who were residents of the state on November 3, 1959, a protest was raised by non-resident veterans of the most recent wars that they had been discriminated against. It was said that many had been forced to leave Kentucky because of the better economic conditions elsewhere and the state had some obligation to reward their former native sons since their departure resulted from conditions beyond their control. This argument, made in good faith and emotionally persuasive, along with other considerations, was instrumental in inducing the legislature to extend the benefits of the Act to non-

residents by the enactment of the Amendment at the special September session in 1960. We are wholly in sympathy with the non-resident veteran and with the motives of the Governor and the legislature in wishing to extend benefits to all those who once had claimed the proud title of "Kentuckian."

Throughout the battles of the bonus, which have been waged before the legislature and before this Court, our sympathetic attention has been mainly directed to the veteran. We now have before us a person who justifiably claims a right to our solemn consideration. He is the Kentucky taxpayer. It is his money we propose to spend.

The basic fallacy of the claim made on behalf of the non-resident is that he has at any time had any rights whatsoever. Neither he nor the resident veteran has any rights or legitimate claims against the Commonwealth. The popular notion of the veterans' "bonus" seems to be that it is a giant give-away, and everyone who has seen service should come in for his share. The taxpayer, however, poses this unanswerable question: What authority has the legislature to donate public monies to citizens of other states for which the Commonwealth will realize no possible benefit?

While the taxpayers' money may be expended in the reasonable discretion of the legislature for a proper public purpose to promote the general welfare of the Commonwealth, unless Kentucky as a whole benefits by this expenditure, it is invalid. We have recognized the legislature could determine that a proper public purpose will be served by giving economic aid to the Kentuckian. In this design a bounty to the non-resident can play no legitimate part.

A public purpose of the state must affect and be beneficial to the inhabitants of the state. Stanley v. Jeffries, 86 Mont. 114, 284 P. 134, 70 A.L.R. 166. See also State ex rel. Owen v. Donald, 160 Wis. 21, 151 N.W. 331, 365. The expenditure of public monies must promote the general welfare of those who are taxed to sustain it. Carman v. Hickman County, 185 Ky. 630, 215 S.W. 408; City of Lexington v. Hager, Ky., 337 S.W.2d 27. Payments to non-residents do not conform to this requirement, and obviously further no Kentucky public purpose upon which such legislation may be validated.

It is contended that such a view is unreasonable since many states have in the past paid veterans' compensation to non-residents without objection. The history of veterans' legislation in other states is not persuasive for four reasons: (1) such payments to non-residents have not heretofore (as far as we have been able to discover by diligent research) *ever been questioned in a court;* (2) other bonus legislation has been relatively contemporaneous with the service of a veteran and it was apparently presumed that veterans inducted from a particular state continued to be, at least constructively, residents of that state; (3) the immediacy of the prior conflict had an emotional appeal that apparently transcended a thorough-going analysis of the basic justification for such broadly beneficial legislation; and (4) no other state has enacted legislation even approaching the comprehensiveness of our law.

An examination of the cases shows that the benefits of such legislation in other states were not indiscriminately extended to non-residents. On the other hand, they were limited to residents by the laws considered in Bosworth v. Harp, 154 Ky. 559, 157 S.W. 1084, 45 L.R.A.,N.S., 692; (upon which the majority seem to rely) People v. Westchester County Nat. Bank, 231 N.Y. 465, 132 N.E. 241, 15 A.L.R. 1344; and Walsh v. Jenks, 135 Conn. 210, 62 A.2d 773.

On the ground of rehabilitation or economic aid to the veteran because of his changed status, valid legislation of this character clearly must be limited to Kentucky citizens. No public purpose of this state could be served by furnishing benefits to citizens of other states.

As is evident from the many cases we have carefully scrutinized, it is only by taking the most liberal view that veterans' "bonus" legislation can be validated at all. There can be no legitimate public purpose in the payment of such compensation to those non-residents made eligible under the Amendment and therefore such Amendment violates section 171 of the Constitution and is invalid, null and void. This is particularly evident when considered in the light of present conditions when the States of the nation are having so much difficulty finding adequate sources of tax revenue.

The closing remarks of Judge Lassing in his dissenting opinion in Bosworth v. Harp, 154 Ky. 559, 157 S.W. 1084, 1088, are most pertinent here:

> "When Legislatures, swayed by sentiment, make reckless appropriations in violation of the plain provisions of the Constitution, the people look to the courts for relief against the oppressive and unjust taxation which such legislation produces; and courts, much as they may sympathize with the condition of those who are made the beneficiaries of such legislation, should hesitate to give to the plain language of the Constitution a strained construction in order to uphold such legislation. *The rights of those not benefited by the act are entitled to the court's protection as much as the rights of those who are.*" (Our emphasis.)

We prefer to substitute the word "unauthorized" for the word "reckless" in the quotation because we believe the Kentucky legislature carefully deliberated over the many difficult problems presented to it by the vote of the people on November 3, 1959. However that may be, it is still our duty to protect the taxpayer who makes a bona fide claim of an invalid expenditure of public funds.

Only by limiting compensation of this sort to residents of this state can it be said that a present state public purpose is involved and that the payment is not for past federal military service. Under no other theory could we logically sustain the position that the state is not intermeddling in the military affairs of the federal government and is not violating the United States Constitution.

For the foregoing reasons, I respectfully dissent. MILLIKEN and PALMORE, JJ., concur in this dissent.